COMMONWEALTH *vs.* JAMES RAY.

Suffolk. June 12, 2001. - October 10, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Bail. Statute,* Construction. *Words,* "Equivalent amount."

This court concluded, based on the legislative history of G. L. c. 276, § 58, the reform context from which it developed, and the purpose it is intended to serve, that a judge may properly set alternative bails in differing amounts as a condition for pretrial release in a criminal case: one in an amount which can be posted in the form of a surety company bond and the other in an amount equal to the maximum nonrefundable premium required to purchase the surety bond but which can be posted only in the form of cash [250,256-257]; and, that the words "equivalent amount" contained in the last sentence of the first paragraph of G. L. c. 276, § 58, mean an amount equal in effect and that, in a bail context, a surety bond set at an amount ten times the amount of a cash bail is equal in effect to that cash bail [258]. SPINA, J., dissenting.

Discussion of the meaning of that portion of G. L. c. 276, § 58, that allows a prisoner to provide an "equivalent amount" in a surety company bond when cash bail is required [251-252], and the history of bail reform in Massachusetts [252-256].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 4, 2001.

An order setting bail was vacated and the case was reported by *Greaney,* J.

*Robert L. Goodale,* Special Assistant District Attorney (*Kevin Connelly,* Assistant District Attorney, with him) for the Commonwealth.

*Paul J. Machado* for the defendant.

The following submitted briefs for amici curiae:

*Greta A. Janusz* for International Fidelity Corporation.

*Thomas F. Reilly,* Attorney General, *John E. Bowman, Jr., & Dean A. Mazzone,* Assistant Attorneys General, for the Attorney General.

*Peter D. Anderson & George T. Campbell, III,* for Richard Verrochi.

CORDY, J. The question before the court is whether a judge may properly set alternative bails in differing amounts as a condition for pretrial release in a criminal case: one in an amount which can be posted in the form of a surety company bond; and the other in an amount equal to the maximum nonrefundable premium required to purchase the surety bond but which can be posted only in the form of cash.[1] In order to resolve the question, we need to interpret the meaning of that portion of G. L. c. 276, § 58, appearing in the last sentence of the first paragraph that provides: "If the justice or clerk or assistant clerk of the district court, the bail commissioner or master in chancery determines that a cash bail is required, the prisoner shall be allowed to provide an *equivalent amount* in a surety company bond" (emphasis added).[2]

Based on the history of the bail statute, the reform context from which it developed, and the purpose it is intended to serve, we conclude that a judge may properly set such alternative bail amounts as a condition of release.

1. *Procedural background.* On December 26, 2000, James Ray was arraigned in the Fall River Division of the District Court Department on complaints charging him with armed assault in a dwelling, armed robbery, assault and battery by means of a dangerous weapon, and intimidation of a witness. Bail was set at $1 million surety bond or $100,000 cash. Subsequently, a grand jury in Bristol County indicted Ray for the same offenses. At Ray's first appearance in the Superior Court, the Commonwealth requested the Superior Court judge to set the same bail terms as had been set in the District Court. The judge denied the request, concluding that G. L. c. 276, § 58, did not empower him to set different surety bond and cash bail amounts.[3] Bail was set at "$100,000 flat." As such, Ray could have satis-

[1]We acknowledge the amicus briefs of the Attorney General, International Fidelity Corporation, and Richard Verrochi.

[2]For the purposes of this opinion, we assume, without deciding, that this provision applies to bail set by judges of the Superior Court as well.

[3]In making his decision, the Superior Court judge relied in part on a recent memorandum and order of a single justice of this court as authority for this interpretation of G. L. c. 276, § 58. See Commonwealth *vs.* Kane, S.J.C. No. 2001-0006 (Jan. 9, 2001). There the single justice considered an appeal by the Commonwealth of an order of a Superior Court judge admitting a defendant

fied the bail condition either by paying $100,000 in cash directly into the court (which would have been refundable to him at the conclusion of the case), or by securing a surety company bond in the face amount of $100,000 by paying a bail bondsman a nonrefundable fee of up to ten per cent (the maximum premium allowed) of the bail amount, that is, up to $10,000.[4]

The Commonwealth filed a petition in the county court pursuant to G. L. c. 211, § 3, for relief from the judge's bail order. A single justice granted the relief, and, declaring the statutory provision in question to be "ambiguous," concluded that the words "equivalent amount" could mean that the amount of the surety bond and cash bail must be equal "or they could mean an 'equivalent amount' of bond that would be obtained by the sum of cash designated as bail, namely $100,000 would purchase a bond of one million." The single justice accepted this latter interpretation, which he noted the Superior Court had been following for some time, and vacated the bail order, remanding it to the Superior Court for further hearing on the basis of that interpretation. He also reserved and reported the matter to the full court for a "definitive decision on the issue," which "is of systemic importance and one which arises on a daily basis in the Trial Court."

2. *The meaning of "equivalent."* The specific provision of G. L. c. 276, § 58, which mandates that a defendant be "allowed to provide an equivalent amount in a surety company

to bail in the amount of $15,000 cash or $150,000 surety bond. While the single justice acknowledged that it was "common practice to set cash bail in an amount equal to the amount of the premium for a surety bond," he nevertheless concluded that such orders were improper under the statute: "The amount of cash bail and the amount of the surety must be equal." Because the single justice could not determine whether the judge admitting the defendant to bail had intended bail to be $150,000 cash or surety bond, or $15,000 cash or surety bond, he remanded the matter for rehearing.

[4]General Laws c. 276, § 61B, provides in part: "All professional bondsmen shall be governed by rules which shall be established from time to time by the superior court." Rule 16 of the Superior Court Rules Governing Professional Bondsmen provides: "No bondsman shall charge or receive for his services in acting as surety excessive or exorbitant fees. Any fee which exceeds in amount or value five per cent of the amount of the recognizance when the bondsman has received security or ten per cent of the amount of the recognizance when the bondsman has not received security shall be deemed excessive or exorbitant."

bond," if a cash bail is required, was added to the statute by amendment in 1981. St. 1981, c. 802, § 2. The term "equivalent" is not defined in the statute and its interpretation in this context is a matter of first impression. The words of a statute are the main source for the ascertainment of legislative purpose, and when the text of a statute is clear and unambiguous, it must be construed in accordance with its plain meaning. See *Delaney v. Commonwealth*, 415 Mass. 490, 494 (1993); *Bronstein v. Prudential Ins. Co.*, 390 Mass. 701, 704 (1984), and cases cited. The word "equivalent," as used here, does not plainly and unambiguously mean equal in value.

The word equivalent has two primary meanings: equal in value and equal in effect.[5] Depending on which of these meanings we ascribe to the Legislature's use of the word, we are led toward a different interpretation of the provision, each of which is rational. Because the text of the statute is ambiguous,[6] it is appropriate to look "at the purpose and legislative history of the statute." *Massachusetts Hosp. Ass'n v. Department of Med. Sec.*, 412 Mass. 340, 346 (1992). When imperfection of language fails clearly to express legislative purpose or intent "[s]tatutes are to be interpreted . . . in connection with their development, their progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part . . . ." *Commonwealth v. Welosky*, 276 Mass. 398, 401 (1931). Through this prism we interpret the statute "in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished." *Telesetsky v. Wight*, 395 Mass. 868, 872 (1985), quoting *Commonwealth v. Galvin*, 388 Mass. 326, 328 (1983).

3. *History of bail reform in Massachusetts*. The legislative

---

[5]Black's Law Dictionary 561 (7th ed. 1999) states that "equivalent" can mean: "1. Equal in value, force, amount, effect, or significance. 2. Corresponding in effect or function; nearly equal; virtually identical." Webster's Third New Int'l Dictionary 769 (1993) defines it as "corresponding or virtually identical especially in effect or function." And the American Heritage Dictionary 462 (1991) defines it as "[h]aving similar or identical effects."

[6]See *Commonwealth v. Wotan*, 422 Mass. 740, 743 (1996) ("Since the term 'repeatedly' has two possible meanings, it is not fanciful or perverse to conclude that the term is ambiguous when applied to the facts of this case").

history of the specific provision inserted by St. 1981, c. 802, is sparse.[7] However, the history of bail reform in Massachusetts, which led to a complete rewriting of G. L. c. 278, § 58, in the 1970's, is not. Because we must consider the words contained in this provision in the context of the system of law of which they are a part, it is necessary to examine that earlier history.

Prior to 1967, the usual means by which a defendant would obtain pretrial release was by posting bail through the purchase of a surety company bond from a professional bail bondsman for a nonrecoverable premium equal to between five and ten per cent of the bond's face amount. The practice was much the same throughout the country.[8] By the 1960's, it was a system that was increasingly viewed as disreputable and unacceptable.[9] The United States Supreme Court noted in a review of the Illinois bail system:

"Prior to 1964 the professional bail bondsman system with all its abuses was in full and odorous bloom in Illinois. Under that system the bail bondsman customarily collected the maximum fee (10% of the amount of the bond) permitted by statute . . . and retained that entire amount even though the accused fully satisfied the conditions of the bond. . . . Payment of this substantial 'premium' was required of the good risk as well as of the bad. The results were that a heavy and irretrievable burden fell upon the accused, to the excellent profit of the bondsman, and that professional bondsmen, and not the courts, exercised significant control over the actual workings of the bail system." (Footnote omitted. Citations omitted.)

*Schilb* v. *Kuebel*, 404 U.S. 357, 359-360 (1971).

---

[7]The official bill history for 1981 House Doc. No. 7176, which was ultimately approved as St. 1981, c. 802, does not indicate that there were legislative hearings, testimony, or reports. All that the history reflects is that the sentence at issue here was "recommended by the House committee on Bills in the Third Reading." 1981 House J. 3123.

[8]See, e.g., Foote, Compelling Appearance in Court: Administration of Bail in Philadelphia, 102 U. Pa. L. Rev. 1031, 1046 (1954).

[9]See Note, Bail: An Ancient Practice Reexamined, 70 Yale L.J. 966 (1961).

Beginning with the passage of St. 1966, c. 681,[10] Massachusetts became a national leader in the bail reform movement, and was the first State to adopt legislation changing the presumption to one of release on personal recognizance rather than release on bail for offenses within the jurisdiction of the District Courts. Spangenberg, Bail Reform in Massachusetts: 1965-1967, 52 Mass. L.Q. 135, 146 (1967). This change in presumption was expanded with the passage of St. 1971, c. 473, § 1 (the Bail Reform Act), to include all crimes except those punishable by death. That act completely rewrote G. L. c. 276, § 58, and provided that a prisoner "shall" be admitted "to bail on his personal recognizance without surety unless . . . [it is determined] that such a release will not reasonably assure the appearance of the prisoner before the court." G. L. c. 276, § 58, as appearing in St. 1971, c. 473, § 1. See *Delaney* v. *Commonwealth*, 415 Mass. 490, 495 (1993), and cases cited ("Our Legislature intended § 58 to protect the rights of the defendant by establishing a presumption that he or she will be admitted to bail on personal recognizance without surety and by delineating carefully the circumstances under which bail may be denied").

While the presumption of personal recognizance reduced the number of defendants required to post bail, it did not eliminate bail altogether. See S.R. Bing & S.S. Rosenfeld, The Quality of Justice in the Lower Criminal Courts of Metropolitan Boston (1970). In a further effort to root out the corruption that existed in the Massachusetts bail bondsman system[11] and reform what remained, this court, on November 16, 1971, ordered a pilot bail project to be carried out in selected District Courts. The

[10]Statute 1966, c. 681, was a special act, adopted as a temporary measure that was to become inoperative on July 1, 1968. It was applicable only to certain offenses before the District Courts, and it did not amend the General Laws with regard to bail.

[11]Among the many problems within the prereform bail system was "collusion between professional bondsmen or surety agents and 'Persons Authorized to Take Bail'"; one Suffolk County bail commissioner reported "that the only way to stay in business is to become [a] 'favorite' of a particular surety agent." Final Report of the Percentage Bail Project to the Chief Justice of the Superior Court and the Chief Justice of the District Courts 10 (Final Report). The flaws of the prereform bail bond system were also exemplified in the case of *Matter of DeSaulnier (No. 4)*, 360 Mass. 787 (1972), in which this court found it necessary to suspend and disbar a Superior Court judge for inappropriate collaboration with a bondsman.

project, named the "percentage deposit bail pilot project," permitted a defendant who was not eligible to be released on his personal recognizance to be released by depositing with the court an amount of money equal to five per cent of the face value of the surety bond he would otherwise have needed to secure. The deposit was to be returned to the accused on his performance of all the conditions of his recognizance.

The project found the default rate for defendants released under these terms was lower than the default rate for defendants released under the professional surety bond system in the courts studied, presumably because the deposit was refundable.[12] See Final Report of the Percentage Bail Project to the Chief Justice of the Superior Court and the Chief Justice of the District Courts 68.[13] The success of the project led to the widespread adoption of the practice in the District Courts. It also led to its incorporation into the administrative regulations of the District Courts.

Administrative Regulation No. 4-77, entitled, "Standards of Judicial Practice, Pretrial Release," was promulgated by the Chief Justice of the District Courts on August 31, 1977.[14] It included standard 1:07, entitled, "Recognizance with Percentage Deposit in Lieu of Surety," which provided: "[I]n lieu of surety, a cash deposit of approximately ten percent of the amount of the recognizance, to be returned to him upon the condition that he appear in court as required, has been found to be an effective technique to insure the voluntary presence of the defendant and is encouraged." The commentary to this standard

---

[12]The purpose of bail is to assure the defendant's appearance in court. *Commonwealth* v. *Stuyvesant Ins. Co.*, 366 Mass. 611, 614 (1975).

[13]The Final Report, *supra* at 18-20, 24-25, also revealed that most suits against bondsmen for forfeiture of the surety bonds of defaulted defendants were settled for nominal "costs" by district attorney's offices far below the face value of the surety bonds. One official remarked that it would "put bondsmen out of business" if they were "required . . . to pay in full for every default." *Id.* at 20.

[14]The Chief Justice noted: "While not mandatory in application in the sense of rules . . . [the standards] represent the qualitative consensus reached by the Committee on Standards as to the various aspects of Pretrial Release procedure dealt with. As such, each court should strive for compliance with the standards and should treat them as a statement of desirable practice which should be departed from only with good reason. In addition, many references are made throughout the standards to provisions of statutory and case law, which, of course, must be observed."

notes: "In order to promote the use of cash deposits in lieu of surety, courts have accepted a percentage of the recognizance amount — usually 10%. Since this practice is now in use, since it works to the defendant's advantage, since the Supreme Judicial Court has reviewed cases in which this procedure was followed, without objecting to it and, perhaps most importantly, since this procedure furthers the objectives of pretrial release, it is recommended . . . where personal recognizance without surety is denied."

Similarly, according to a July 14, 1998, letter from the State bail administrator to the House chairman on the joint committee on the judiciary, the Superior Court committee on bail (bail committee) began recommending and encouraging judges in that court to enter bail orders that included both a surety bond amount and a cash amount equal to the maximum ten per cent fee that could be charged to secure such a bond.

In the context of this history, we are confident that the Legislature, in amending § 58 in 1981, did not intend to encourage a renewed preference for surety bonds over the percentage cash bail system that had emerged in the 1970's as a successful and widely accepted model of bail reform. Then as now the "consensus is that cash bail systems, despite [any] flaws, are a better alternative to the bondsman regime." Harmsworth, Bail and Detention: An Assessment and Critique of the Federal and Massachusetts Systems, 22 New Eng. J. on Crim. & Civ. Confinement 228-229 (1996).

Our view finds further support in the long-standing interpretation given to the language of the 1981 amendment by the bail committee. Shortly after the 1981 amendment to § 58 took effect, the bail committee interpreted the "equivalent amount" language to mean that, if bail was set by a judge at a single figure, e.g., $1,000, the statute required the defendant to post either the entire amount as cash bail or pay a bondsman to secure a surety bond in the same amount. If, however, a judge issued an order setting one amount for cash bail and another for a surety bond, then the statute's language did not apply to the bail order because the judge had specified what amount in each arrangement represented the acceptable risk to the court.

While we may not fully agree with the bail committee's

reasoning regarding the proper application of G. L. c. 276, § 58, its twenty-year unchallenged history supporting the setting of alternative bail amounts, combined with the continuing practice by many of the Commonwealth's courts of setting ten per cent cash bail as an alternative to surety bonds, suggests that, if the Legislature had intended to abolish this practice, the language it enacted in 1981 plainly failed to do so.[15] While the Legislature has amended G. L. c. 276, § 58, on numerous occasions since 1981, it has never changed this language and has rejected several attempts to further amend this portion of the statute to provide specifically that "the amount of bail set whether in cash or surety shall be the same."[16] See, e.g., 1999 Senate Doc. No. 893.

[15]Ray contends that lobbyists for the bail bond industry were responsible for the 1981 amendment, and, therefore, the Legislature must have intended the language to mean that surety bonds and cash bail alternatives be set in the same amount, otherwise the amendment would not have been in furtherance of the interests of its proponents. This argument confuses the intention of the private proponents of legislation with the intentions of the legislative body that enacted the statutory change, to the extent we may ascertain them. They are not necessarily the same. If it was the intention of the Legislature to require that cash bail and surety bond bail be set in the exact same dollar amount, it could have said so simply and unambiguously. More importantly, Ray's argument ignores the magnitude of the challenges facing the bail bond industry in 1981. The industry was under wholesale attack, and there was a powerful national movement to bar commercial sureties from posting bail altogether. This movement culminated in 1985 with a call by the American Bar Association for the abolition of professional bondsmen, 2 ABA Standards for Criminal Justice, standard 10-1.3(c) (2d ed. rev. 1985), and led to the adoption by the National Conference of Commissioners on Uniform State Laws of a uniform rule of criminal procedure that excluded the posting of bonds by compensated sureties. Unif. R. Crim. P. 341(g)(2), 10 U.L.A. 42 (Spec. Pamph. 1992). See 2 ABA Standards for Criminal Justice, supra at standard 10-5.3(d). In Massachusetts, some judges had begun setting cash-only bail in the 1970s, a practice noted and discouraged in the District Courts' 1977 Standards of Judicial Practice, Pretrial Release, as being of "questionable legality." See Administrative Regulation No. 4-77, standard 1:08. In this context, any statutory support for the continued viability of any form of surety bond in Massachusetts (even if not as attractive to defendants as a cash alternative) would have been a legislative accomplishment for the industry. General Laws c. 276, § 58, as amended in 1981, accomplishes this objective even as we have interpreted its meaning today.

[16]Contrary to the dissent's suggestion, even in cases in which a judge sets bail in the form of a bond and a ten per cent cash alternative, a surety bond might be a more feasible or attractive option for some defendants. A surety company is free to set a fee for its bond below the ten per cent maximum al-

4. *Conclusion.* In light of the statute's history and purpose, we conclude that the words "equivalent amount" contained in the last sentence of the first paragraph of G. L. c. 276, § 58, mean an amount equal in effect. In the bail context, we conclude that a surety bond set at an amount ten times the amount of a cash bail is equal in effect to that cash bail. The reasons are several: the amount of the surety bond is equal to the minimum value of bond that could be obtained with the sum set as cash bail; the financial burden on the defendant is virtually the same; and the effect of ensuring the defendant's appearance in court throughout the proceedings is as great. The practice of setting the amount of the surety bond at ten times the amount of cash bail or, otherwise stated, of providing for a ten per cent cash equivalent to the surety bond, is therefore permitted by the statute.

*So ordered.*

SPINA, J. (dissenting). I respectfully dissent. General Laws c. 276, § 58, states that, if "cash bail is required, the prisoner shall be allowed to provide an equivalent amount in a surety company bond." I do not see any ambiguity in the statute, and I do not believe any ambiguity is created by the "two primary meanings" of the word "equivalent," as identified by the court. *Ante* at 252. A bond equal in value to cash bail is the same as a bond equal in effect to cash bail, and in either case, that means that the face amount of the bond is the same as the cash bail set by a judge.

In my view, the construction given the statute by the court does not arise from any ambiguity in the word "equivalent" but from the unstated indirect object of the verb "provide." Under the statute, bail, whether it be in the form of cash or a surety bond, is provided to only one entity. That entity must be the Commonwealth. The result reached by the court requires two different indirect objects of the verb "provide": the Com-

lowed by Rule 16 of the Superior Court Rules Governing Professional Bondsmen, and if the defendant posts other security (e.g., real estate) with the bonding company, the *maximum* fee for the bond drops to five percent.

monwealth, if the defendant provides cash bail; and the bail bondsman, if the defendant provides the "equivalent amount" (" 'equivalent amount' of bond that would be obtained by [providing the bail bondsman] the sum of cash designated as bail, namely $100,000 would purchase a bond of one million," *ante* at 251).

The result reached by the court runs counter to basic rules of statutory construction. Three aspects of that result bear mention. The first is the meaningless choice presented to a defendant, who can either pay the cash bail to the clerk of court and recover that amount at the end of the case, or pay an equivalent amount to a bail bondsman as the premium for a surety bond, plus fees, and recover nothing after disposition of the case. Second, if the bail bond system were as pernicious as the court has described, and the studies provided by the amici suggest that it is not, then the Legislature could have eliminated bondsmen altogether rather than devise such a convoluted, indirect method of putting bail bondsmen out of business. Third, the bail statute expresses a preference for personal recognizance, grounded in the presumption of innocence, and it thus calls for bail to be set in a reasonable amount. See *Mendonza* v. *Commonwealth*, 423 Mass. 771, 774 (1996). As the bail statute is now construed, the surety bond is not a viable alternative for a defendant who cannot afford cash bail to obtain his freedom pending trial.

The court relies on the "twenty-year unchallenged history supporting the setting of alternative bail amounts" for support. *Ante* at 257. In truth, judges set bail in a variety of ways, a point noted by the court. Judges set bail according to the formula approved by the court; judges set bail according to the formula subscribed by this dissent; and judges use other formulae for setting bail (e.g., $10,000 cash; $25,000 surety). There is nothing inherently wrong with any of these methods. The Legislature could amend the statute to reflect, and validate, these practices, thereby giving judges the flexibility needed to address circumstances when setting bail to ensure the presence of a defendant at trial.

Because I see no ambiguity in the words of the statute, I believe that those words should be given their common meaning such that the amount of the surety bond a defendant may

post, its face value, represents an amount equivalent to the cash bail set by the judge.