Gants, Ralph D., J.
The plaintiff Pauli Hejinian (“Hejinian”) was married to Charlotte Ellertson (“Ellertson”), who died of cancer on March 21, 2004. At the time of her death, Ellertson had a $1,000,000 life insurance policy with the defendant General American Life Insurance Company (“General American”), with Hejinian as her beneficiary (“the Policy”). On July 13, 2004, Hejinian filed a claim for death benefits under Ellertson’s Policy with General American. On November 9, 2004, General American denied Hejinian’s claim on the ground that Ellertson had failed to disclose that she had been diagnosed with cancer at the time the Policy was delivered. Hejinian then brought this action against General American, alleging that it breached the insurance contract, as well as the covenant of good faith and fair dealing, and committed an unfair settlement practice in violation of G.L.c. 93A and 176D by refusing to pay the death benefit on the Policy. Hejinian also brought this action against insurance agent Peter Rodis (“Rodis”) and Rodis’s employer, New England Life Insurance Company d/b/a Strategic Financial Partners (“New England Life”), for professional negligence for their alleged failure to submit Ellertson’s application to General American in a timely manner.
The Court severed and stayed Hejinian’s claim for unfair settlement practices in violation of G.L.c. 93A and 176D pending the resolution of the claims concerning coverage (i.e. the claims for breach of contract and breach of the covenant of good faith and fair dealing). Now before the Court are Hejinian’s motion for partial summary judgment as to coverage under the Policy and General American’s cross motions for summary judgment as to the coverage claims, as well as Rodis’s and New England Life’s separate motions for summary judgment as to the claims brought against them.[1] After hearing, for the reasons detailed below, Hejinian’s motion for summary judgment as to coverage is ALLOWED, and General American’s motion for summary judgment is DENIED. In light of the *685 allowance of Hejinian’s motion for summary judgment as to coverage, Hejinian’s claims against New England Life and Rodis are DISMISSED AS MOOT, since those claims survive only if this Court were to find no coverage under the Policy.[2]
BACKGROUND
The material facts are not in dispute. On February 14, 2003, the 36-year-old Ellertson completed and signed an Application for Life Insurance (“the Application”) for a ten-year, $1,000,000 life insurance policy with General American, which she submitted to her insurance agent, Rodis.[3] At the time Ellertson completed the Application, she had not been diagnosed with any serious medical condition. The Application identified Ellertson’s husband, Hejinian, as the beneficiary.[4] The Application consisted of a form that called for general information (“General Application Form”), and a Medical Declarations form (“Medical Declarations Form”). Two versions of the Medical Declarations Form were completed: one by Ellertson herself and one by a paramedical examiner.
On the Medical Declarations Form, Ellertson was asked to respond to various questions concerning her health. Among other things, Ellertson was asked to declare whether in the last ten years she had been treated for or diagnosed as having any disease or disorder of the reproductive organs or breasts; any disorder of the thyroid or lymph glands or other endocrine disorders; or “cancer, tumor, cyst or disorder of the skin.” Medical Declarations Form at 1. She answered “no” to all but the question concerning “cancer, tumor, cyst or disorder of the skin,” and wrote that she had a “benign mole removed.” Ellertson was also asked to identify the doctor able to provide the most complete and up-to-date information concerning her health. Id. She checked the box indicating “none.”
Various Declarations were printed towards the end of the General Application Form, including:
“I agree that [t]he statements and answers in this application and any amendments to it, in any supplements, or made to the medical examiner are true and complete to the best of my knowledge and belief . . .”; General Application Form at 4.
“I agree that [i]f a premium payment is not given, then insurance will take effect when a policy is approved by the Company for issue as applied for, the first full premium is paid and the health and insurability of any person proposed for insurance have not changed since the date of this app [sic].” Id. and
“The Applicant and agent certify that the Applicant has read, or had read to him or her the completed application and that he or she realizes that any false statement or misrepresentation therein may result in loss of coverage under the policy.” Id.
Ellertson signed the General Application Form below the Declarations. She did not pay a premium at the time she submitted the Application.
At the end of the Medical Declarations Form, Ellert-son signed the Form below the printed statement, “I agree that the statements and answers in this Medical Declarations [sic] are true and complete to the best of my knowledge and belief.” Medical Declarations Form at 2.
In conjunction with the Application, General American engaged American Para Professional Systems (“APPS”) to conduct a paramedical examination of Ellertson.[5] APPS sent a physician unlicensed in the Commonwealth of Massachusetts to conduct the examination.[6] The examination took place on February 4, 2003. The examination consisted of Ellertson’s response to questions concerning her medical history contained on the Medical Declarations Form and the collection of blood and urine samples. General American did not require Ellertson to submit to a medical examination.[7] See Baime Aff. ¶¶8-9 (“By supplying APPS with a Medical Declarations form . . . [General American] defined the content of that... examination. This form indicates that. . . Prescott’s examination of . . . Ellertson was a paramedical examination rather than a medical examination.”).
There is no evidence that, as of February 14, 2003, when Ellertson signed the General Application and Medical Declaration Forms, having already completed her paramedical examination, she knew or had reason to know that any of the medical information in her Application was false.[8] However, on March 25, 2003, she visited Dr. Alan Drabkin at Mount Auburn Hospital because of a cyst on her breast that the doctor assessed as a swollen lymph gland. He asked her to return in two weeks to determine if she needed a biopsy. She returned the next day, though, to see Dr. Drabkin, now complaining of increased pain in that area and a sense that the lump had changed in size. Dr. Drabkin’s examination caused him to question his prior assessment, since there was now less of a discrete mass on her breast, and he recommended that she see a surgical colleague, Dr. Marvin Corlette, for an urgent consultation.
Dr. Corlette saw her that day and, after examination, doubted that the lump on Ellertson’s breast was cancerous. He told her to take aspirin and soak the location, and to return if she noticed any change in the lump. Dr. Corlette saw her again on May 6 or 7, 2003, and used a needle to remove tissue from the location of the lump on her breast. The tissue was sent to Mount Auburn Hospital’s Pathology Department for testing, which determined that the tissue contained cancer cells, indicating that she had some form of cancer. On May 8, 2003, after a more complete examination of Ellertson, Dr. Corlette referred her to Dr. Lisa Weissman, an oncologist, who Ellertson saw on June 3, 2003. Dr. Weissman found a five-to six-centi *686 meter mass on her left breast, and diagnosed her with breast cancer, with a 45-50 percent chance of survival over the next five to ten years. She recommended the commencement of chemotherapy to attack the cancer. On June 6, 2003, Ellertson saw Dr. Judy Garber of the Dana Farber Cancer Institute for a second opinion. Dr. Garber confirmed that Ellertson had cancer and suspected that it was breast cancer.
General American approved the Application on June 11, 2003 and the Policy was delivered to Ellertson on June 23, 2003. The Policy identifies the “Date of Issue,” defined as the “effective date of the coverage under this policy,” as July 10, 2003. Policy, Specifications Page & 1. While Hejinian asserts that Ellertson had not been conclusively diagnosed to have cancer when the Policy was delivered to her, there is no dispute that, by that date, she had been diagnosed as having cancer.
When the Policy was delivered to Ellertson, it was accompanied by a Notice and Policy/Certificate Delivery Receipt. The Receipt states:
Thank you for applying to us for your life insurance. We appreciate the fact that you and your insurance agent, an independent business person, have chosen General American Life Insurance Company to meet your insurance needs. We recognize that you have made an important financial decision in purchasing your policy from us. General American is committed to providing you with quality service.
In order to continue to provide you with quality insurance products at competitive premium rates, it is necessary that our underwriters have complete and accurate information on the lives of individuals applying for insurance. Therefore, it is only fair to you and to all of our policyholders that questions on the application are answered completely to the best of your knowledge. Please review carefully the answers recorded to the questions in the copy of the application that is attached to this policy. Contact us immediately, in writing or by calling the Home Office ... if any answers are not complete and true to the best of your knowledge and belief.
Below this information in the Notice is what is referred to as a “Certification” which declares in pertinent part:
I acknowledge that I have received Policy Number 3,838,523 on this date and accept it as issued. The coverage provided by this policy was explained to me. I understand the insurance protection provided.
I certify that Part I and Part II (medical or non-medical) of the application were attached to this policy when it was delivered to me. I have reviewed these parts of the application and the answers provided were accurately recorded. The answers are complete, correct and true to the best of my knowledge and belief. I further certify that the information contained in these parts of the application remains true and correct to the best of my knowledge and belief as of this date. There has been no change in my health since the date of the application and/or examination for insurance.
Ellertson signed and returned this Receipt on June 23, 2003, along with a check for payment of the first premium.
Ellertson timely made all premium payments on the Policy. After her death from cancer on March 21, 2004, Hejinian filed a claim on July 13, 2004, which was within the two-year period in which General American was permitted under the Policy to contest the claim. General American conducted an investigation into Ellertson’s health and, on November 9, 2004, denied Hejinian’s claim because of her failure to disclose her cancer in the Receipt at the time the Policy was delivered.
DISCUSSION
There are two Massachusetts statutes that address when an insurer may avoid payment on an insurance policy because of misrepresentations made by the insured: G.L.c. 175, §§186 & 124. G.L.c. 175, §186, which was enacted in 1878, provides:
No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.
G.L.c. 175, §186.
G.L.c. 175, §124, which was enacted fourteen years later in 1892, provides:
In any claim arising under a policy issued in the commonwealth by any life company, without previous medical examination . . . the statements made in the application as to the age, physical condition and family history of the insured shall be held to be valid and binding on the company; but the company shall not be debarred from proving as a defense to such claim that said statements were wilfully false, fraudulent, or misleading.
G.L.c. 175, §124.
While §186 generally applies to all insurance policies, §124 is limited only to life insurance policies that are issued without prior medical examination. The Appeals Court has held that the intent of the Legislature in enacting §124 was to carve out an exception from § 186 and render it inapplicable to cases involving life insurance policies without prior medical examinations. Torres v. Fidelity & Guaranty Life Ins. Co., 34 Mass.App.Ct. 376, 380 (1993), quoting Taylor, The Life Insurance Law of Massachusetts, 19 B.U.L.Rev. 53, 112 (1939). The Appeals Court reasoned that “if §186 also applies to life insurance policies issued without *687 medical examination, §124 would be virtually meaningless.” Id. at 378. “It must be presumed that the Legislature intended to accomplish something substantial by the enactment of the later statute. It must be presumed also in this connection that the Legislature was aware of [§186].” Id., quoting Boston & Maine R.R. v. Hartford Fire Ins. Co., 252 Mass. 432, 435 (1925). The Court also observed, “Moreover, where two provisions are in conflict, if a specific provision (life insurance policy issued without medical examination) is enacted subsequent to a more general rule, the specific and not the general provision applies.” Torres at 378.
Consequently, an insurer may avoid payment on a life insurance policy in which the insurer obtained a prior medical examination of the insured if the insured, while negotiating the policy, made a misrepresentation regarding her physical condition that increased the risk of loss, regardless of whether or not the misrepresentation was made with an actual intent to deceive, because §186 would apply to that claim. However, an insurer may avoid payment on a life insurance policy in which the insurer did not obtain a prior medical examination of the insured only if the insured made a wilfully false, fraudulent, or misleading statement in her application regarding her physical condition, because §124 would apply to that claim. “[T]he effect of G.L.c. 175, §124 ... is to increase the insurers’ burden of proof when it attempts to rescind, within two years, life insurance policies issued without medical examinations.” Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 631 (1997).[9]
There can be no dispute here that Ellertson did not receive a prior medical examination, since the person who performed the examination was not licensed in Massachusetts to practice medicine. See Robinson v. Prudential Ins. Co. of America, 56 Mass.App.Ct. 244, 245 (2002) (a “medical examination” is “an examination by a physician”); see generally Sullivan, 425 Mass. at 625 n. 12 (describing history of medical examination requirement). Therefore, General American may avoid payment on Ellertson’s life insurance policy under § 124 only if she made a statement in her “application” regarding her physical condition that was wilfully false, fraudulent, or misleading.
There is no evidence that Ellertson made a wilfully false, fraudulent, or misleading statement in the Application Ellertson submitted on February 14, 2003. Specifically, there is no evidence that, at that time, she had (or recognized) the apparent cyst on her breast that caused her to visit Dr. Drabkin on March 25, 2003, and no evidence that any doctor had provided her with any diagnosis suggesting that she had cancer. General American, however, properly observes that there is abundant evidence demonstrating that, by June 23, 2004, when she signed the Receipt and returned the Policy with payment of the premium, she knew she had breast cancer. The issue, then, is whether this Receipt is part of her “application” for life insurance. If it is, then Hejinian’s motion for partial summary judgment as to coverage must be denied, because there is plainly a genuine issue of material fact as to whether she made a wilfully false, fraudulent, or misleading statement when she signed the Receipt.[10] If the Receipt is not part of the application, then Hejinian’s motion for partial summary judgment as to coverage must be allowed, since statements made outside of the application, even if wilfully false, would have no bearing on the question of coverage.
General American contends that the word, “application,” as used in G.L.c. 175, §124, includes not merely the document it called the Application for Life Insurance, but also the document it provided to Ellertson when it sent her the Policy that it called the Notice and Policy/Certificate Delivery Receipt. This Receipt, General American argues, should be viewed as part of the application because General American asked the insured to make additional representations at the time the Policy was delivered and before its effective date. Hejinian contends that the “application” is simply the Application on which General American relied in approving the Policy, not the Receipt that was sent to Ellertson with the Policy.
To interpret the meaning of a statute, a court first considers the plain language of the statute in order to discern legislative intent. Commonwealth v. Millican, 449 Mass. 298, 300 (2007) (“The language of the statute is the primary source of insight into the intent of the Legislature”). Unless defined by the statute, words are understood to have their ordinary and common meaning. Crenshaw v. Macklin, 430 Mass. 633, 634 (2000), citing O’Brien v. Director of the Div. of Employment Sec., 393 Mass. 482, 487-88 (1984). “[W]here . . . the language of a statute is clear and unambiguous, it is conclusive as to the intent of the Legislature.” Ciardi v. E Hoffman-La Roche, Ltd., 436 Mass. 53, 60-61 (2002). It is only when the language is ambiguous that it is appropriate for a court to look at the legislative purpose and history. Commonwealth v. Ray, 435 Mass. 249, 252 (2001). In the words of the Supreme Judicial Court:
When imperfection of language fails clearly to express legislative purpose or intent “(statutes are to be interpreted ... in connection with their development, their progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part . . .” Commonwealth v. Welosky, 276 Mass. 398, 401 (1931). Through this prism we interpret the statute “in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished.” Telesetsky v. Wight, 395 Mass. 868, 872 (1985), quoting Commonwealth v. Galvin, 388 Mass. 326, 328 (1983).
Commonwealth v. Ray, 435 Mass. at 252.
*688 The word “application” is not defined in the statute. The definition, according to The American Heritage Dictionary of the English Language, includes both “[t]he act of applying” and “[a] request, as for assistance, employment, or admission to a school” or “[t]he form or document on which such a request is made.” The American Heritage Dictionary of the English Language at 87 (4th ed. 2000). The plain and ordinary meaning of an application in the context of life insurance is the document prepared by the prospective insured on which the life insurance company will rely in deciding whether or not to approve the applicant for insurance, and the price or terms of the policy to be issued.
Here, it is plain that Ellertson had been approved by General American on June 11, 2003 and had been sent the Policy before she ever received the Notice and Policy/Certificate Delivery Receipt which is the source of the alleged fraudulent misrepresentations. The Policy that was sent to her declared on its cover page, “This policy is a legal contract between the policyowner and General American.” It did not say that it became a legal contract only when Ellertson signed it; rather, it declared that the Policy would be “deemed void from the start” if she returned the Policy within 20 days of receiving it, which by implication means that it would not be deemed void if she failed to return it. The Policy later declared:
We have issued this policy in consideration of the application and payment of premiums. This policy, the application for it, any riders or endorsements, copies of which are attached to and made a part of the policy, are the entire contract.
Policy at 2. Since the Policy was issued before Ellert-son saw the Notice and Policy/Certificate Delivery Receipt, the Policy could not be referring to it when it spoke of the “application” in consideration of which the Policy was issued. Moreover, as noted earlier in footnote, the Policy later declared, “Material misstatements will not be used to void the policy or deny a claim unless made in the application, a copy of which is attached to and made a part of the policy when issued or delivered.” The reference to the “application” had to be the February 14, 2003 Application, not the Notice and Policy/Certificate Delivery Receipt, which had yet to be seen or signed by Ellertson. In short, it is plain that the application on which General American relied to issue the Policy was the Application, not the Notice and Policy/Certificate Delivery Receipt, and that, when the Policy itself speaks of the “application,” it is referring to the Application and not the Notice and Policy/Certificate Delivery Receipt.
General American contends that the word “application” in §124 should be interpreted to include all communications between the insurance company and the prospective insured prior to the effective date of the Policy, not simply the document that General American itself referred to as the application. This Court has already shown that this interpretation of the word “application” does not comport with its ordinary and common meaning, including the meaning given to the word by General American. This interpretation is also inconsistent with the legislative history of §124. As noted earlier, in §186, which predated §124, the Legislature permitted an insurer to avoid a policy based on any material misrepresentation made in the “negotiation” of a policy. In §124, a life insurer that did not conduct a prior medical examination could avoid a policy based only on fraudulent statements made in the “application.” “Negotiation" has been defined as “the entire transaction of applying for and finally issuing the completed contract of insurance.” Everson v. General Fire & Life Assur. Corp., 202 Mass. 169, 172 (1909). This Court presumes that, when the Legislature uses different language in corresponding provisions, it intends different meanings. See Ginther v. Commissioner of Ins., 427 Mass. 319, 324 (1998). This Court accordingly presumes the Legislature to have intended the word “application” in § 124 to mean something different from and narrower than the word “negotiation” used in §186. By choosing the word “application” rather than “negotiation,” the Legislature affirmatively did not wish to permit life insurance companies to avoid payment on a policy based on a fraudulent statement made at any time during “the entire transaction of applying for and finally issuing the completed contract of insurance,” but rather intended to limit the insurer’s defense to fraudulent misrepresentations contained in the application itself. Accordingly, §124 does not permit General American to avoid payment on the Policy based on alleged fraudulent misrepresentations contained in the Notice and Policy/Certificate Delivery Receipt.
In the alternative, General American focuses on the small print of the Declarations in the Application, which reads, “I agree that [i]f a premium payment is not given, then insurance will take effect when a policy is approved by the Company for issued as applied for, the first full premium is paid and the health and insurability of any person proposed for insurance have not changed since the date of this application].” General American contends that, as a result of this sentence, since Ellertson did not pay her first full premium until June 23, 2003, the insurance never took effect because her health and insurability had changed since the date of the Application. There are two fatal flaws with this argument, one based on the language of the Policy and the other on the language of G.L.c. 175, §124.
With respect to the Policy language, as noted earlier, the Policy specifically declares that it is a legal contract; it does not state that it becomes a legal contract only if the health and insurability of the prospective insured has not changed since the date of the Application. Nor does the Notice and Policy/Certificate Delivery Receipt itself anywhere state that the Certifi *689 cation, which includes the declaration that “[t]here has been no change in health since the date of the application,” must be signed in order for the Policy to take effect.
With respect to the language of the statute, if General American’s argument were to prevail, it would effectively gut G.L.c. 175, §124, because it would permit a life insurance company to avoid a policy in which no prior medical examination was given based on post-application changes in the health of the insured. Moreover, it would permit a life insurance company to avoid a policy without any wilfully false or fraudulent statement by the insured; any adverse change in health or insurability, as determined by the insurance company, would permit the company to find that the life insurance policy never became effective. This is precisely the type of conduct that the Legislature was seeking to prevent by enacting §124. See Sacks v. Sun Life Assurance Co. of Canada, Civil No. 02-0726, 16 Mass. L. Rptr. 461, 462 (Middlesex Super.Ct. Apr. 23, 2003) (Chernoff, J.) (rejecting similar argument by life insurer, finding that it would permit the insurer to “circumvent[ ] the statute”).
General American argues that this interpretation is unfair because it allows Ellertson’s beneficiaiy to recover on her Policy even though she knowingly misrepresented the state of her health when she signed the Notice and Policy/Certificate Delivery Receipt. Even assuming that she did (which this Court does not find but recognizes materially to be in dispute), General American’s argument is better directed to the Legislature than to this Court. The fact of the matter is that, under §124, a life insurance company that has not conducted a medical examination of its prospective insured has no defense to a life insurance claim based on a statement made by the insured decedent after the application, even if the statement was wilfully false. For all practical purposes, once the life insurer approves the policy based on statements in the application that were not wilfully false, fraudulent, or misleading, it must pay on the policy even if the applicant later were knowingly to conceal that she had just been diagnosed with a terminal illness. Stated differently, the insurer must determine whether to approve the policy based on the applicant’s non-fraudulent description of her health at the time of the application. Once it approves the policy based on the statements in the application, any deterioration in the applicant’s health is irrelevant, even if that deterioration has occurred between the date the application was submitted and the date the insurance became effective. If the life insurer wishes the broader scope of defenses available to it under §186, it must require its applicants to submit to a medical examination.
General American made an economic choice not to require a medical examination of Ellertson based on her age. The insurer determined that a 36-year-old woman applying for a $1,000,000 life policy was not a high enough risk to warrant a medical examination. Presumably, that is because it costs General American less to pay the rare policy that comes due based on the insurer’s failure to require a medical examination than to pay the cost of a medical examination for every 36-year-old potential insured, who, by virtue of his or her age, presents minimal risk. The Court will not second-guess General American’s economic choice, and General American may not reasonably second-guess the legal consequence of that choice, which is that it has no defense to coverage under §124 and must pay Ellertson’s Policy.
Despite General American’s protestations, this outcome is entirely consistent with the legislative purpose that gave birth to §124 in 1892 and which remains vital to this day. Section 124 was enacted at the repeated insistence of the Commissioner of Insurance, who in his annual report in 1888, recommended that:
[I]f. . . risks are taken without a medical examination, alleged misrepresentation by the applicant— who in a large number of these cases is made to understand next to nothing of the statement he is asked to sign — as to his physical condition, ought not to be permitted as a bar when a claim arises. Misrepresentation by the agent and misunderstanding by the assured now lead, under the methods thus pursued, to almost innumerable cases of hardship and injustice.
Torres, 34 Mass.App.Ct. at 378-79, quoting Commissioner of Insurance Thirty-Third Annual Report (1888), Pub. Doc. No. 9, part two at vii. See also Sullivan, 425 Mass. at 623-24. Here, General American seeks to deny death benefits to Ellertson’s beneficiary based solely on her signing of the Notice and Policy/Certificate Delivery Receipt. This document was characterized in its heading as a Receipt, not as a supplement to her application. While the signature line on this Receipt was placed below a section entitled “Certification,” she was not asked to answer any questions. Rather, the Certification was structured so that her signature could be characterized as essentially answering “yes” to many unrelated compound questions. Essentially, General American argues that, by signing this form, Ellert-son had represented:
1. that she had received the Policy;
2. that she accepted the Policy as issued;
3. that the coverage in the Policy was explained to her;
4. that she understood the insurance protection provided;
*690 5. that the entire Application was attached to the Policy when she received it;
6. that she has reviewed the Application and the answers were accurately recorded;
7. that the answers in the Application were complete, correct, and true when made;
8. that the answers in the Application remain true today; and
9. that there has been no change in her health since the date of the Application or physical examination for insurance.
Refusing to pay death benefits based on the contention that the decedent’s signature on a document characterized as a Receipt adopted nine assertions, including assertions as simple as acknowledging receipt and as complex as declaring no change in the condition of her health, is precisely the type of “gotcha” tactics that the Commissioner of Insurance railed against in 1888 and ultimately prevailed upon the Legislature to change in 1892 by enacting §124. Since the insured will always be dead when death benefits are denied, one can virtually never be certain whether the insured signed the Receipt without reading it carefully, perhaps.thinking her signature simply acknowledged receipt of the Policy, or whether she carefully read every sentence in the Certification and knowingly misrepresented that her health had not changed since she signed the Application. If an insurer is going to claim that an insured made a knowing misrepresentation in an application, the insurer should, at a minimum, identify the document as an application, not a receipt, and ask individual questions, not compound ones.
ORDER
For the reasons detailed above, Hejinian’s motion for partial summary judgment as to coverage under the Policy is ALLOWED and General American’s cross motion for summary judgment is DENIED. General American’s motion to strike portions of Hejinian’s opposition to its motion, which portions were irrelevant to the Court’s determination of the issues, is MOOT. In light of the Court’s ruling, the claims against Rodis and New England Life are DISMISSED AS MOOT, since those claims survive only if this Court were to find no coverage under the Policy. With the coverage claim having been resolved, this Court now VACATES the stay as to Hejinian’s claim for unfair settlement practices in violation of G.L.c. 93A and 176D. Hejinian may now proceed to conduct discovery on and prosecute that claim.

General American and Rodis also filed separate motions to strike portions of Hejinian’s opposition to their motions for summary judgment.

Because the statements General American and Rodis requested stricken are irrelevant to the Court’s determination of the motions for summary judgment, the motions to strike are also denied as moot.

Rodis did not submit the application to General American until March 4, 2003. Rodis’s delay in submitting the application is the basis for Hejinian’s negligence claims against Rodis and his employer, New England Life.

Hejinian also signed the part of the application that requested general information. Hejinian did not sign the Medical Declarations form.

APPS provides both paramedical and medical examinations. “A paramedical examination typically consists of a blood sample, urine sample, pulse and blood pressure readings, and a series of questions regarding the applicant’s health. A medical examination, in contrast, typically contains all the components of the paramedical examination plus a heart check and additional questions.” Affidavit of David S. Baime of American Para Professional Systems (“Baime Aff.") 13. In addition, “While no license is required to perform a paramedical examination, only a licensed physician may perform a medical examination.” Id. ¶4. According to Regional Director of APPS David S. Baime (“Baime”), the examination of Ellertson was a paramedical examination. Baime Aff. ¶¶8-9.

The physician, employed as a contractor by APPS, was Jennifer Marcia Prescott, M.D. (“Prescott”), who has a medical degree but is not licensed to practice in the Commonwealth or in any other jurisdiction. According to Baime, Prescott, as an unlicensed physician, may not conduct a medical examination and has not conducted any medical examination on behalf of APPS during the time of Baime’s employment at APPS.

In accordance with its practice, General American does not require an applicant for a $1,000,000 life insurance policy to submit to a medical examination unless the applicant is 61 years of age or older.

There is evidence in the record that, prior to February 14, 2003, Ellertson had been tested and found to carry a BRCA-2 mutation in her genes, which meant that her lifetime risk of developing breast cancer was between 50-80 percent, which is substantially higher than the lifetime risk of the general population, which was 12 percent. This genetic test, however, did not render false her denial in the Medical Declarations Form that she had not been “treated for, or diagnosed as having” cancer, since she had neither received treatment for cancer nor been diagnosed with anything but a propensity for developing cancer.

General American seeks to invoke language in its Policy that provides that material misstatements in the application may avoid the Policy, and argues that this provision permits it to avoid the Policy even without a finding of a wilfully false, fraudulent, or misleading statement in the application. It is plain, however, that an insurer may not obviate its higher burden of proof under §124 to avoid a life insurance policy simply by including language in the policy that provides a lower burden of proof. See Torres, 34 Mass.App.Ct. at 379 (“the Legislative intent. . . was to preclude the insurer from raising any defenses not contained in §124”); Sullivan, 425 Mass. at 631.

To prove its defense to payment under the Policy, General American would need to prove more than that Ellertson knew she suffered from breast cancer on June 23, 2003. It would have to prove that she knew that, by signing the Receipt, she was making a representation that her physical condition had not changed since February 14, 2003. If she had not read the Certification in the Receipt and did not recognize that her signature constituted a sworn certification that her health had not materially changed, then General American would likely fail to sustain its burden of proving that she made a wilfully false or fraudulent statement.