**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DIRECTV, INCORPORATED; ECHOSTAR
SATELLITE, L.L.C.,
              *Plaintiffs-Appellants,*

              v.

E. NORRIS TOLSON, in his official
capacity as Secretary of Revenue,                    No. 07-1250
              *Defendant-Appellee.*

———————————————

NORTH CAROLINA CABLE
TELECOMMUNICATIONS ASSOCIATION,
              *Amicus Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Louise W. Flanagan, Chief District Judge.
(5:05-cv-00784-FL)

Argued: December 5, 2007

Decided: January 10, 2008

Before NIEMEYER and SHEDD, Circuit Judges, and
Leonie M. BRINKEMA, United States District Judge for the
Eastern District of Virginia, sitting by designation.

———————————————

Affirmed by published opinion. Judge Shedd wrote the opinion, in
which Judge Niemeyer and Judge Brinkema joined.

———————————————

## COUNSEL

**ARGUED:** Pantelis Michalopoulos, STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Appellants. Michael David Youth, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Mark F. Horning, Janice D. Gorin, STEPTOE & JOHNSON, L.L.P., Washington, D.C.; Christopher G. Smith, J. Mitchell Armbruster, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellants. Christopher G. Browning, Jr., Solicitor General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. Mark J. Prak, Marcus W. Trathen, Charles F. Marshall, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Amicus Supporting Appellee.

## OPINION

SHEDD, Circuit Judge:

Plaintiffs DIRECTV, Inc. and Echostar Satellite, LLC, providers of satellite television programming, brought this suit claiming that North Carolina's system of taxing multi-channel television programming violates the Dormant Commerce Clause of Article I of the United States Constitution. The district court granted Defendant E. Norris Tolson's motion to dismiss, concluding that Plaintiffs' suit is barred by the Tax Injunction Act and principles of comity, that Plaintiffs lack standing, and that Plaintiffs failed to state a claim on which relief can be granted. We hold that Plaintiffs' suit is barred by principles of comity and therefore affirm.

I

A.

Consumers have two main choices for the purchase of subscription multi-channel television programming: traditional "cable" providers and direct broadcast satellite ("DBS") providers. Both types of service

provide substantially the same programming, but each uses a different means to deliver that programming to subscribers.

Cable providers deliver their programming through networks of coaxial or fiber optic cables laid in trenches, alongside roads, or hung on utility poles. These networks are physically connected to subscribers' homes. Thus, cable providers rely on the use of public rights-of-way for the delivery of their programming. Historically, cable providers in North Carolina have been required to obtain franchises from city and county governments entitling them to operate within designated franchise areas. In exchange for these franchises, local governments, with the authorization of the North Carolina General Assembly, have typically levied franchise taxes on cable providers.

By contrast, DBS providers transmit their programming from satellites orbiting the earth from space directly to satellite dishes mounted on or near subscribers' homes. Accordingly, DBS providers do not rely on public rights-of-way for the delivery of their programming, and federal law prohibits local governments from charging franchise taxes or fees to DBS providers. Telecommunications Act of 1996, Pub. L. No. 104-104, Title VI, § 602(a), 110 Stat. 144 (1996) (reprinted at 47 U.S.C. § 152, historical and statutory notes).

B.

North Carolina has amended its taxation of multi-channel television programming several times in recent years. Prior to 2002, neither satellite nor cable TV providers were subject to sales tax on their gross receipts. At the same time, cities and counties had statutory authority to grant franchises to cable operators, *see* N.C. Gen. Stat. §§ 160A-319 and 153A-137 (West 2001), and to levy a "franchise tax" — typically 5% of cable operators' gross receipts in the franchise area — in exchange for those franchise rights. *See* N.C. Gen. Stat. §§ 160A-214 and 153A-154 (West 2001).

Beginning in 2002, North Carolina imposed a 5% sales tax on the gross receipts of DBS providers. *See* N.C. Gen. Stat. § 105-164.4(a)(6) (West 2005). Cable operators continued to pay franchise taxes to localities as they had done before. The net effect of the tax, therefore, was that both cable and DBS providers paid 5% of their

gross receipts to the State and/or its political subdivisions. Plaintiffs unsuccessfully challenged this scheme on Commerce Clause grounds in North Carolina state court. *See DIRECTV, Inc. v. State*, 632 S.E.2d 543 (N.C. Ct. App. 2006).

Beginning in 2005, North Carolina imposed a sales tax of 7% on the gross receipts of both cable and DBS providers. *See* N.C. Gen. Stat. §§ 105-164.3(4a) and 105-164.4(a)(6) (West 2006). Cable providers continued to pay franchise taxes to local governments, but were permitted to take a credit against the state sales tax in the amount they paid in local franchise taxes. *See* N.C. Gen. Stat. § 105-164.21B (West 2005). The net effect of this scheme was that both satellite and cable providers paid 7% of their gross receipts to the State and/or its political subdivisions.

In 2006, further amendments to North Carolina's taxation of multi-channel television providers created the tax scheme at issue in this lawsuit. *See* An Act to Promote Consumer Choice in Video Service Providers and to Establish Uniform Taxes for Video Programming Services, 2006 N.C. Sess. Laws 2006-151 (the "2006 Amendments"). The 2006 Amendments revoked the authority of local governments to charge franchise taxes to cable providers and vested franchising authority with the North Carolina Secretary of State. *See id.* §§ 1, 10-13. At the same time, the 2006 Amendments eliminated the tax credit available to cable providers, subjecting them to the full 7% state sales tax on gross receipts. *See id.* § 9. The 2006 Amendments also provide that a portion of the proceeds of the state sales tax on cable and DBS providers be distributed to local governments. For those local governments that previously imposed franchise taxes on cable providers, the amount of this distribution is based on the revenue formerly generated by those taxes. *See id.* § 8, (adding N.C. Gen. Stat. § 105-164.44I). Counties or cities that did not charge franchise taxes also receive a portion of the state tax revenue under the 2006 Amendments, in amounts based on their populations. *See id.* Accordingly, just as they did in 2005, both cable and DBS providers now pay taxes equal to 7% of their gross receipts. Those taxes, however, are paid only to the State, which in turn distributes a portion of the proceeds to local governments according to state law.

## II

### A.

We turn briefly to a discussion of the constitutional principles underlying Plaintiffs' claims. The Commerce Clause provides that Congress "shall have the power . . . [t]o regulate Commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. This grant of affirmative Congressional authority carries with it an implied or "dormant" restriction of the power of states to regulate interstate commerce, prohibiting them from enacting laws that impose "substantial burdens" on commerce between the states. *Dennis v. Higgins*, 498 U.S. 439, 447 (1991) (internal quotation and citation omitted). The clearest example of a state law that violates the Dormant Commerce Clause is one that facially discriminates against interstate commerce, such as a protective tariff or customs duty. *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994); *see also Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). Even a facially neutral state law, however, violates the Dormant Commerce Clause "when its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman*, 476 U.S. at 579. Likewise, a state runs afoul of the Dormant Commerce Clause even when it joins an otherwise constitutional tax with an otherwise constitutional subsidy in a way that benefits in-state economic interests and burdens out-of-state interests. Thus, in *West Lynn*, the Supreme Court struck down a Massachusetts milk pricing order that combined a nondiscriminatory tax on milk sales with an otherwise permissible subsidy of Massachusetts dairy farmers because, taken together, the two provisions had a discriminatory effect. 512 U.S. at 199-202. The Court emphasized that state economic regulation must be considered as a whole, and found particularly troubling the fact that the proceeds from the tax were used to create a "subsidy to one of the groups hurt by the tax" — *i.e.*, the in-state dairy farmers. *Id.* at 200.

### B.

Plaintiffs are the two main providers of DBS service in North Carolina and nationally and are two of only three companies that own and operate DBS satellites. They brought this suit in 2005 under 42 U.S.C. § 1983, alleging that North Carolina's tax credit for cable pro-

viders violated the Dormant Commerce Clause because the credit was granted to companies based on their in-state distribution of television programming. After the 2006 Amendments became effective, Plaintiffs amended their complaint to challenge North Carolina's present tax scheme. Plaintiffs seek a declaratory judgment that sections 8 through 15 of the 2006 Amendments violate the Dormant Commerce Clause, a permanent injunction barring the State from enforcing section 8 of the 2006 Amendments, and attorneys' fees and costs.

Plaintiffs argue that North Carolina's present taxation scheme is no different from that struck down by the Supreme Court in *West Lynn*, because it combines an evenhanded tax on sales of subscription multichannel television programming with a subsidy available only to cable providers and funded from the proceeds of the tax. Although no distributions of sales tax proceeds are made directly to cable providers, and although not all localities that do receive these distributions previously charged franchise taxes, Plaintiffs argue that an unconstitutional subsidy exists because "[c]able providers no longer have to pay franchise fees, but continue to receive the valuable right of access to publicly owned rights-of-way they formerly obtained through the payment of such fees." J.A. 126. There is no constitutional difference, Plaintiffs claim, between payments directly to cable providers and the distributions made to North Carolina's political subdivisions under the 2006 Amendments. Plaintiffs argue that the alleged subsidy imposes a significant cost disadvantage on DBS providers, who are forced to fund the subsidy. Plaintiffs further claim that because DBS providers use out-of-state distribution facilities and cable operators necessarily use in-state distribution facilities, the subsidy discriminates against DBS providers in violation of the Dormant Commerce Clause.

The district court dismissed Plaintiffs' amended complaint on several grounds. First, the district court held that Plaintiffs' suit is barred by the Tax Injunction Act, 28 U.S.C. § 1341, (TIA or the "Act") and related principles of comity. Second, the district court held that even if the suit were not barred, Plaintiffs lack standing to challenge North Carolina's taxation scheme because they lack an injury in fact and because the injury they claim cannot be redressed by the relief they seek. Third, the district court held that even if Plaintiffs did have standing, their amended complaint failed to state a claim upon which

relief could be granted. In so holding, the district court concluded that the 2006 Amendments provide no subsidy to cable operators and therefore do not discriminate against interstate commerce. Plaintiffs now appeal. We review *de novo* the district court's dismissal of Plaintiffs' amended complaint. *Palmer v. City Nat. Bank of W. Virginia*, 498 F.3d 236, 244 (4th Cir. 2007).

### III

### A.

The Supreme Court long ago "recognized the important and sensitive nature of state tax systems and the need for federal-court restraint when deciding cases that affect such systems." *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 102 (1981). As the Court has explained:

> It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public.

*Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 110 (1871). Accordingly, the Court has articulated a principle of comity that reflects the "scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts," requiring federal courts, when the comity principle applies, to deny relief in challenges to state tax laws "in every case where the asserted federal right may be preserved without it." *Fair Assessment*, 454 U.S. at 108 (internal quotation and citation omitted).

This comity principle found legislative voice in the enactment of the Tax Injunction Act, which provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy

may be had in the courts of such State." 28 U.S.C. § 1341. But while the TIA reflects the antecedent comity principle, the principle itself is broader than the Act and "was not restricted by its passage." *Fair Assessment*, 454 U.S. at 110. Indeed, the Supreme Court has continued to apply it in tax cases, *see, e.g.*, *id.* at 116; *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293 (1943), as well as in other contexts. *See, e.g.*, *Younger v. Harris*, 401 U.S. 37 (1971) (holding that comity principles prohibit federal courts from enjoining pending state criminal prosecutions except in extraordinary circumstances).

In *Fair Assessment*, the Supreme Court addressed the applicability of the comity principle to suits bringing constitutional challenges to state tax laws under 42 U.S.C. § 1983. The Court acknowledged that § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343, authorize "immediate resort to a federal court whenever state actions allegedly infringe[ ] constitutional rights." 454 U.S. at 104 (citing *Monroe v. Pape*, 365 U.S. 167 (1961)). Nevertheless, the Court explained that § 1983 actions challenging state tax laws are inherently intrusive, threatening to disrupt state tax collection and to chill even good-faith actions of state officials. *Id.* at 114-15. Therefore, the Court held that "taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts" so long as "plain, adequate, and complete" remedies are available in the state courts. *Id.* at 116. It is clear that this holding applies to claims for both legal and equitable relief under § 1983. *See id.*; *Great Lakes*, 319 U.S. 293; *Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*, 220 F.3d 298, 302 (4th Cir. 2000).

B.

In applying these principles to this case, we begin our analysis with the relief sought by Plaintiffs. In their prayer for relief, Plaintiffs ask the district court to "declare that Sections 8 through 15 of the 2006 Amendments violate the Commerce Clause of Article I and Article VI of the United States Constitution." J.A. 130. As explained above, these sections repealed the system of local franchise taxation previously in place in North Carolina, repealed the tax credit formerly available to cable providers, and provide for the distribution of part of the proceeds of the state sales tax to local governments in lieu of the franchise taxes those governments collected previously. Accord-

ingly, the relief requested in Plaintiffs' amended complaint would have the effect of restoring the system of local franchise taxation coupled with state-level tax credits to cable providers that existed prior to the enactment of the 2006 Amendments.

On appeal, Plaintiffs contend that they never meant to ask for a declaration that section 9 of the 2006 Amendments — the provision restoring the tax credit to cable providers that Plaintiffs claimed was unconstitutional in their original complaint — is unconstitutional. They characterize the inclusion of section 9 in their prayer for relief as "inadvertent" and urge us to "construe the[ir] complaint liberally" to effectively eliminate this request. Notably, although Plaintiffs intimate that the district court erred in not affording them an opportunity to amend, the record reflects that Plaintiffs themselves made no motion to do so in the district court.

We need not resolve the matter, however, because we conclude that even if we ignore Plaintiffs' request to restore the tax credit to cable providers, principles of comity nevertheless preclude the federal courts from entertaining Plaintiffs' suit. Plaintiffs admit that they seek "an order declaring that the provisions in the 2006 Amendments repealing local government authority to charge franchise fees be declared unconstitutional." Brief of Appellants at 25-26. As Plaintiffs explain, such an order "would restore the power of local governments to determine, in their own discretion, whether or not to charge such fees for the benefits they confer on cable systems." *Id.* at 26. In essence, Plaintiffs ask us to mandate the reinstatement of local franchise taxing authority, a prerogative that North Carolina's General Assembly has seen fit to reserve to itself. It is just this sort of heavy-handed federal court interference in state taxation that the principle of comity is intended to avoid.

Plaintiffs, however, contend that tax comity considerations do not apply to their requested relief because franchise taxes are really not taxes at all, but instead are "rent" or "fees" paid to local governments for the use of public rights-of-way. Thus, we turn our analysis to the nature of the franchise charges at issue here.

Because the principle of comity reflects the recognition that states should be free from federal interference in the administration of their

fiscal operations, we interpret the term "tax" broadly for purposes of our jurisdictional inquiry. *See Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000). We have previously considered the factors a court should consider in determining whether a government-imposed charge constitutes a "tax" or a "fee":

> The "classic tax" is imposed by the legislature upon a large segment of society, and is spent to benefit the community at large. The "classic fee" is imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes, or to raise "money placed in a special fund to defray the agency's regulation-related expenses."

*Id.* (internal citations omitted). Accordingly, we consider three factors: (1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge.[1] *Id.* When this inquiry places the charge somewhere between the "classic tax" and the "classic fee," it is the purpose behind the statute that imposes the charge, as reflected in the ultimate use of its proceeds, that is the most important factor. *Id.*

We conclude that — at least for purposes of our comity analysis — the charges levied on cable providers by North Carolina's political subdivisions prior to the 2006 Amendments were taxes. These charges were imposed not by an administrative or regulatory agency, but by North Carolina's political subdivisions with the authorization of the General Assembly. *See* N.C. Gen. Stat. §§ 153A-154, 160A-214 (West 2005). Franchise charges are also spread among a wide proportion of the population, because cable providers are authorized by statute to pass along the costs of franchise charges to their customers. 47 U.S.C. § 542(c); *see also Valero*, 205 F.3d at 134 (noting passing of waste disposal charges from users of landfills to generators of

---

[1] We note that while the North Carolina statutes authorizing localities to charge for franchises refer to these charges as "taxes," *see* N.C. Gen. Stat. §§ 153A-154, 160A-214 (West 2005), this consideration is not dispositive. *See Valero*, 205 F.3d at 134 (focus is on factual circumstances surrounding the charge, not the nomenclature used).

the waste weighed in favor of finding those charges to be taxes). In addition, the only evidence in the record demonstrates that the proceeds of franchise charges go into the general operating funds of the localities that levy them, rather than into discrete funds established for the maintenance of public rights-of-way.[2] J.A. 150-61. Moreover, we note that the fact that the 2006 Amendments replaced franchise taxes with a state-level tax also supports the conclusion that North Carolina's franchise charges are taxes, not fees.[3]

## C.

Having concluded that the franchise charges at issue here are taxes, we also conclude that the relief sought by Plaintiffs is of the very sort that comity principles prevent federal courts from granting. In this regard, we find the First Circuit's decision in *United States Brewers*

[2]Plaintiffs argue that we should permit this case to move to the evidentiary stage because the factual record concerning the purpose and use of the franchise taxes levied by localities is underdeveloped. The problem with this approach is that it permits the very evil that the comity principle is intended to avoid: intrusive federal litigation that threatens to compromise state tax systems. For purposes of our broad construction of "tax" in the context of comity, the record before us is sufficient.

[3]We find the cases cited by Plaintiff to the contrary — none of which involved comity considerations — to be unpersuasive. *City of Dallas v. FCC*, 118 F.3d 393 (5th Cir. 1997), did not analyze any of the factors discussed in *Valero*, but rather likened franchise charges to fees because cable providers receive something in exchange for them: the right to use public rights-of-way. *See id.* at 397-98. Taxpayers, however, often receive something of value in exchange for their taxes — such as access to landfills as in *Valero* — and therefore we find that this singular consideration is not dispositive. *City of St. Louis v. Western Union Telegraph Co.*, 148 U.S. 92 (1893), involved a five-dollar-per-pole charge levied by St. Louis on telegraph companies for the use of the city's telegraph poles. In determining that this charge was rent, as opposed to a tax, the Supreme Court relied on the fact that the charge was not "graduated by the amount of the business, nor is it a sum fixed for the privilege of doing business," and expressly distinguished city taxes levied on the gross income of telegraph companies. *Id.* at 97. By contrast, the franchise charges at issue here are tied to the gross receipts of cable providers and are charged for the privilege of obtaining a franchise.

*Ass'n, Inc. v. Perez*, 592 F.2d 1212 (1st Cir. 1979), to be instructive. In *Perez*, mainland beer producers sought an injunction to prevent Puerto Rico from collecting an increase in the internal revenue tax on beer or, in the alternative, to enjoin Puerto Rico from granting an exception to the tax to beer producers whose total production did not exceed 31,000,000 wine gallons. *Id.* at 1213. In effect, the alternative relief sought by the plaintiffs in *Perez* would have required Puerto Rico to collect a tax its legislature had declined to impose. Relying on comity principles, the First Circuit held that the case must be dismissed:

> [A]n order of a federal court requiring [Puerto Rico] officials to collect taxes which its legislature has not seen fit to impose on its citizens strikes us as a particularly inappropriate involvement in the state's management of its fiscal operations. This is neither a case in which a court orders reluctant state officials to collect taxes authorized by the citizens of the state, nor one in which officials have failed to perform their "special responsibility" to levy taxes for a crucial public purpose and consequently have violated federal constitutional rights. As appellees point out, the invalidation of the [tax] exemption . . . is an awkward and heavy-handed remedy, producing a broad taxing statute for which [Puerto Rico] may have believed there was no need or which was actually detrimental to its domestic policy. Sound equity practice and a concern for interests of federalism thus bar both the injunctive and declaratory relief sought by appellants.

*Id.* at 1215 (internal citations omitted).

We conclude that principles of comity apply with even more force to the relief Plaintiffs seek here. While the relief sought in *Perez* would have required Puerto Rico not to enforce a single tax exemption, what Plaintiffs ask for here is a federal court-ordered redistribution of intra-state taxation authority. This relief would be heavy-handed indeed, and would be a particularly inappropriate intrusion by the federal courts into North Carolina's tax laws.

Relying on a footnote in *Hibbs v. Winn*, 542 U.S. 88 (2004), a case interpreting the TIA, Plaintiffs argue that their suit is not barred by

principles of comity because those principles "do[ ] not apply to tax-payer suits that do not disrupt state tax collection." Brief of Appel-lants at 28. In *Hibbs*, Arizona taxpayers brought an Establishment Clause challenge to certain income tax credits available to those who made contributions to nonprofit organizations that provided scholar-ship grants to children attending private schools, including religious schools. The Supreme Court held that the TIA did not bar the suit because (1) the plaintiffs did not contest their own tax liability and (2) the relief they sought would not impede Arizona's collection of tax revenue. *Hibbs*, 542 U.S. at 93. Explaining its prior tax comity cases, the Court stated that it "has relied on 'principles of comity' to pre-clude original federal-court jurisdiction only when plaintiffs have sought district-court aid in order to arrest or countermand state tax collection." *Id.* at 107 n.9 (citing *Fair Assessment*, 454 U.S. 100; *Great Lakes*, 319 U.S. 293).

We do not read this footnote as limiting the comity principle in the way Plaintiffs suggest. As the Court of Appeals for the Tenth Circuit has observed, *Hibbs*' characterization of prior tax cases was intended to underscore the unusual claim before the Court in *Hibbs*, not to dis-avow those earlier holdings. *See Hill v. Kemp*, 478 F.3d 1236, 1249 & n.11 (10th Cir. 2007) (citing *Valero*, 205 F.3d 130).

Furthermore, in discussing the scope of the TIA, the *Hibbs* Court explained that Congress's particular concern in enacting § 1341 was to prevent plaintiffs from challenging their own state tax liabilities in federal court. 542 U.S. at 108-09. Thus, "[t]here was no articulated concern about federal courts' flogging state and local governments to collect additional taxes" animating the TIA itself. *Id.* at 109 (internal quotation and citation omitted). As we have already explained, how-ever, the comity principle underlying the TIA is broader than the Act itself, and its scope is not restricted by § 1341. *See Fair Assessment*, 454 U.S. at 110. Thus, nothing in the Supreme Court's conclusion that *§ 1341* was motivated by the specter of federal court challenges to state tax liabilities suggests that broader *comity* principles would not bar suits attempting to force state tax collection, to say nothing of suits seeking federal court-ordered reallocation of taxation authority

between a state and its political subdivisions.[4] The question was simply not before the Supreme Court in *Hibbs*.[5]

### D.

The final question we must address is whether Plaintiffs have a "plain, adequate, and complete" remedy available for the constitutional violations they allege in North Carolina's courts. We have no difficultly concluding that they do, and Plaintiffs do not argue otherwise. Plaintiffs have already challenged an earlier version of North Carolina's taxation scheme in state court, *see DIRECTV, Inc. v. State*, 632 S.E.2d 543 (N.C. Ct. App. 2006), and they are free to do so again, with ultimate appeal to the Supreme Court of the United States.[6]

### IV

We hold that principles of comity prevent the federal courts from ordering North Carolina to restore taxing authority to its political subdivisions that it has seen fit to revoke. Plaintiffs thus may not maintain their challenge under § 1983 in the federal courts while the courts of North Carolina remain available to hear it. We therefore affirm the order of the district court dismissing Plaintiffs' amended complaint.[7]

*AFFIRMED*

---

[4]In light of our conclusion that comity precludes us from mandating reinstatement of local franchise taxing authority in North Carolina, and therefore bars Plaintiffs' suit, we need not address Defendant's argument that suits seeking federal court-ordered redistribution of state tax revenue are likewise barred.

[5]Indeed, the *Hibbs* Court fully understood the First Circuit's holding in *Perez*. In distinguishing *Perez* from the case before it in *Hibbs*, the Court merely observed that *Perez* was not a TIA case and therefore could not support the argument that the TIA barred suits aimed at forcing state collection of taxes. *Hibbs*, 542 U.S. at 109 n.11.

[6]Indeed, this is the way that *West Lynn*, the case primarily relied on by Plaintiffs in their Dormant Commerce Clause argument, reached the Supreme Court. 512 U.S. at 192; *see also Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) (Dormant Commerce Clause challenge to Hawaii liquor tax proceeded through Hawaii courts).

[7]In light of our disposition, we need not consider the other bases for the district court's dismissal.