NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11658


DIRECTV, LLC, & another[1] vs. DEPARTMENT OF REVENUE.



Suffolk.    November 4, 2014. - February 18, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.



Taxation, Excise, Broadcasting company.  Interstate Commerce. Constitutional Law, Interstate commerce.



Civil action commenced in the Superior Court Department on January 26, 2010.

The case was heard by Thomas P. Billings, J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.


E. Joshua Rosenkranz, of New York (Jeremy N. Kudon & Nicholas G. Green, of New York, Eric A. Shumsky, of the District of Columbia, & Kelley A. Jordan-Price with him) for the plaintiffs.

Pierce O. Cray, Assistant Attorney General (Kirk G. Hanson, Assistant Attorney General, with him) for the defendant.

The following submitted briefs for amici curiae:

_____

[1] Dish Network L.L.C.

Eric S. Tresh, Amelia Toy Rudolph, & Zachary T. Atkins, of Georgia, & Nicholas M. O'Donnell & David Nagle for New England Cable & Telecommunications Association.
John Bergmayer, of the District of Columbia, & Karen A. Pickett for Public Knowledge.
Kristen S. Scammon for Satellite Broadcasting & Communications Association.
John A. Hinman, of California, & Allison M. O'Neil & Jamie C. Notman for National Association of Wine Retailers.
Sheldon H. Laskin & Lila D. Disque, of the District of Columbia, for Multistate Tax Commission.
David Parkhurst, of the District of Columbia, & David Hadas for National Governors Association.

LENK, J.  General Laws c. 64M, § 2, imposes a five per cent excise tax on video programming delivered by direct broadcast satellite (tax).  The plaintiffs are two companies that provide services subject to the tax (satellite companies).  They brought a complaint for declaratory and injunctive relief in the Superior Court, alleging that the tax violates the commerce clause of the United States Constitution.[2]  The satellite companies contend that the tax discriminates against interstate commerce, both in its effect and in its purpose, by disfavoring them as compared with those companies that provide video programming via cable (cable companies).  The satellite and cable companies that operate in Massachusetts are all incorporated and headquartered in other States; the satellite

---

[2] The companies that provide video programming delivered by direct broadcast satellite (satellite companies) also argued below that the excise tax violates their right to equal protection.  They do not pursue this claim on appeal.

companies argue, however, that the cable companies represent in-State interests inasmuch as their in-State commercial operations are substantially greater than those of the satellite companies.

A Superior Court judge granted summary judgment in favor of the defendant, the Department of Revenue (department). The satellite companies appealed, and we allowed their application for direct appellate review.

We conclude that summary judgment was warranted. The cable companies and the satellite companies are subject to similar tax obligations, which differ primarily in the ways in which they are collected and calculated. These differences are grounded in important characteristics of the cable and satellite companies' respective methods of operation, and in the different regulatory regimes to which they are subject. The satellite companies thus have raised no genuine issue as to the facts material to their claim of discrimination against interstate commerce, and the department is entitled to judgment as a matter of law.[3]

1. Facts. We summarize the undisputed facts important to our analysis, focusing on the nature of the video programming

---

[3] We acknowledge the amicus briefs submitted by Public Knowledge, the Satellite Broadcasting and Communications Association, and the National Association of Wine Retailers on behalf of the satellite companies; and the briefs by the National Governors Association, the Multistate Tax Commission, and the New England Cable and Telecommunications Association on behalf of the Department of Revenue.

industry; the similarities and differences between the methods of operation used by the participants in this industry, namely cable companies and satellite companies; these companies' respective economic impacts on Massachusetts; their respective tax obligations; and the changes to those obligations introduced by the Legislature in 2010.

a.  The video programming industry.  The service that permits customers to view a variety of video channels on their television sets is known as multi-channel video programming. The satellite companies compete in the market for video programming services primarily with cable companies, including Comcast Corporation (Comcast) and Charter Communications Inc. Verizon Communications, Inc. (Verizon), a telephone company, participates in this market as well.  All of the major participants in the market for video programming services, including Verizon, are incorporated and headquartered outside of Massachusetts.

The cable companies and the satellite companies both offer several programming packages.  These packages generally include local broadcasts, basic cable channels, premium cable channels, pay-per-view movies and events, and on-demand programming. Customers typically choose between cable and satellite on the basis of considerations such as price, customer service, reception quality, and program offerings.

b.  Methods of operation.  The methods of operation used by the cable and satellite companies overlap substantially.  Both types of company purchase the rights to distribute programming from content providers.  Both designate certain percentages of their channel capacity to public, educational, and government programming.[4]  Both advertise their services using television, billboards, mail, newspapers, and the Internet.  Both lease some equipment, such as set-top boxes (which convert signals for viewing on television sets) and recording devices, to their subscribers.

The cable companies and the satellite companies differ, however, in the methods by which they assemble and deliver programming to their customers.  The cable companies assemble their programming in local facilities known as "headends."  There are approximately sixty headends in Massachusetts.  At the headends, programming signals are gathered by satellite dishes and fiber optics equipment.  These signals are then processed, packaged, and delivered to customers' homes through networks of cables laid on the ground or hung from buildings and poles.[5]

---

[4] See note 16, infra.

[5] Telephone companies like Verizon Communications, Inc., use similar technology.

The satellite companies, by contrast, collect, process, and package their programming at "uplink centers."  Each of the satellite companies has two primary uplink centers nationally.  These uplink centers are located outside Massachusetts.  Programming signals are transmitted from the uplink centers to satellites orbiting the earth, and then relayed to small receiver dishes mounted on or near customers' homes.  The satellite companies maintain small, intermittently-staffed "collection facilities," which gather content from local broadcast stations and transmit it to the uplink centers.

c.  Economic impact.  The methods of assembly and delivery used by cable and satellite result in different impacts on the Commonwealth's economy.  From 2006 to 2010, the cable companies spent more than $1.6 billion in Massachusetts, including investments in headend facilities, cable networks, and vehicles.  As of 2010, the cable companies employed approximately 5,500 people in Massachusetts.

The satellite companies, on the other hand, hire relatively few employees in Massachusetts.  Their expenditures on facilities and equipment are concentrated primarily on their out-of-State uplink centers.  The satellite companies also pay fees to the Federal government for the right to locate their satellites in outer space and to use certain transmission frequencies.

d.  <u>Tax obligations</u>.  Both the cable companies and the satellite companies are subject to real property taxes in Massachusetts, and both pay personal property taxes on possessions located in the Commonwealth.  They both pay State income taxes, and they collect and remit sales tax on certain transactions.

The cable companies, in addition, pay "franchise fees" to local governments.  The rates of these fees are determined in negotiated agreements.  Under Federal law, franchise fees may be no higher than five per cent of a cable company's gross revenue from the provision of cable services.  See 47 U.S.C. § 542(b) (2012).  Typically, the fees charged in Massachusetts are three to five per cent of gross revenue.  Local governments also usually impose an additional fee on cable companies, at an average rate of 1.09% of gross revenue, dedicated to supporting public, educational, and government programming.  In addition to these fees, cable companies ordinarily are required by local governments to (a) provide services, facilities, and equipment for the use of public, educational, and governmental channels; (b) deliver free video programming services to municipal buildings, schools, and libraries; and (c) meet certain service

quality and customer service requirements.[6]  A Federal statute prohibits the imposition of any such fees or taxes on the satellite companies at the local level, but it permits the taxation of the satellite companies by the States.  See Telecommunications Act of 1996 § 602, P.L. 104-104, 110 Stat. 144 (reprinted in notes following 47 U.S.C. § 152 [2012]) (Telecommunications Act).

e.  Changes introduced in 2010.  The Act making appropriations for the fiscal year 2010,[7] St. 2009, c. 27 (2010 appropriations act), introduced two significant changes to the scheme of taxation that governs the video programming industry. First, the 2010 appropriations act established the excise tax. See St. 2009, c. 27, § 61, enacting G. L. c. 64M.  The excise tax is imposed upon the satellite companies at a rate of five per cent of their gross revenues derived from the provision of

---

[6] The agreements between the local governments and the companies that provide video programming via cable (cable companies) also typically require that the companies set aside channels for public, educational, and governmental programming. These obligations apparently augment the requirement of Federal law that the cable companies designate a percentage of their channel capacity to public-oriented programming.  See note 16, infra.

[7] The full title of the act is "An Act making appropriations for the fiscal year 2010 for the maintenance of the departments, boards, commissions, institutions and certain activities of the Commonwealth, for interest, sinking fund and serial bond requirements and for certain permanent improvements."

video programming in Massachusetts.  See G. L. c. 64M, §§ 1, 2.

The satellite companies pass on the cost of the excise tax to

their customers.  See G. L. c. 64M, § 3.[8]

The 2010 appropriations act also imposed a personal

property tax on "[p]oles, underground conduits, wires and pipes

of telecommunications companies."  St. 2009, c. 27, § 25,

amending G. L. c. 59, § 18.  "[T]elecommunications companies"

are defined to include "cable television, [I]nternet service,

telephone service, data service and any other telecommunications

service providers."  Id.  In essence, this provision increased

the personal property tax liability of the cable and telephone

companies, but not of the satellite companies (which do not use

poles, wires, and the like).

2.  Legal framework.  a.  Summary judgment.  We review a

grant of summary judgment de novo.  See Federal Nat'l Mtge.

Ass'n v. Hendricks, 463 Mass. 635, 637 (2012); 81 Spooner Rd.,

LLC v. Zoning Bd. of Appeals of Brookline, 461 Mass. 692, 699

(2012). Summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and responses to

requests for admission . . . , together with the affidavits, if

any, show that there is no genuine issue as to any material fact

---

[8] The cable companies also pass on the cost of the franchise
fees to their customers.

and that the moving party is entitled to a judgment as a matter of law."  Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).  The evidence in the record must be viewed "in the light most favorable to the nonmoving party."  Surabian Realty Co. v. NGM Ins. Co., 462 Mass. 715, 718 (2012), quoting Fuller v. First Fin. Ins. Co., 448 Mass. 1, 5 (2006).  We "need not rely on the rationale cited and 'may consider any ground supporting the judgment.'"  District Attorney for N. Dist. v. School Comm. of Wayland, 455 Mass. 561, 566 (2009), quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).

b.  The dormant commerce clause.  The commerce clause provides that "Congress shall have Power . . . to regulate commerce with foreign nations, and among the several [S]tates, and with the Indian Tribes."  Art. I, § 8, cl. 3 of the United States Constitution.  The United States Supreme Court has "long interpreted the commerce clause as an implicit restraint on [S]tate authority, even in the absence of a conflicting [F]ederal statute."  United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007) (collecting cases).  This implicit restraint is known as the "dormant" commerce clause.  See id.

A State tax is permissible under the dormant commerce clause if it "[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does

not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State."  Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977).  See American Trucking Ass'ns v. Michigan Pub. Serv. Comm'n, 545 U.S. 429, 438 (2005).  The satellite companies' challenge to the excise tax is limited to the third of these requirements, namely the prohibition on discrimination against interstate commerce.

c.   Discrimination against interstate commerce.  The ban on discrimination against interstate commerce is rooted in the "principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy."  Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or., 511 U.S. 93, 98 (1994) (Oregon Waste), quoting H.P. Hood & Sons v. Du Mond, 336 U.S. 525, 537-538 (1949).  The dormant commerce clause seeks to prevent economic "Balkanization," Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 276 (1984), and to protect "an area of free trade among the several States."  Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 328 (1977), quoting McLeod v. J.E. Dilworth Co., 322 U.S. 327, 330 (1944).

In the context of the dormant commerce clause, "'discrimination' simply means differential treatment of in-[S]tate and out-of-[S]tate economic interests that benefits the

former and burdens the latter." Oregon Waste, 511 U.S. at 99.[9]

The concept of "discrimination" also implicitly assumes "a

comparison of substantially similar entities." General Motors

Corp. v. Tracy, 519 U.S. 278, 298 (1997).[10]

A statute may be discriminatory on its face, in its effect,

or in its underlying purpose. See Amerada Hess Corp. v.

Director, Div. of Taxation, 490 U.S. 66, 75 (1989) (Amerada

---

[9] Notwithstanding the stated simplicity of this test, the United States Supreme Court has recognized that its "case-by-case" approach to the dormant commerce clause "has left 'much room for controversy and confusion and little in the way of precise guides to the States.'" Westinghouse Elec. Corp. v. Tully, 466 U.S. 388, 403 (1984), quoting Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 329 (1977). See also E. Chemerinsky, Constitutional Law, Principles and Policies, § 5.3 at 444-445 (4th ed. 2011).

[10] In General Motors Corp. v. Tracy, 519 U.S. 278, 299 (1997), the United States Supreme Court determined that the entities involved were dissimilarly situated because they "serve[d] different markets." Relying on the analysis of Tracy, the satellite companies argue that any entities that serve the same market are necessarily similarly situated. But the conceptual prerequisite that entities must be "substantially similar" in order for discrimination to occur also may be undermined by other types of differences. Thus, "competing in the same market is not sufficient to conclude that entities are similarly situated." National Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown, 567 F.3d 521, 527 (9th Cir. 2009). See Amerada Hess Corp. v. Director, Div. of Taxation, 490 U.S. 66, 78 (1989) (Amerada Hess) (differential treatment permissible when it "results solely from differences between the nature of [entities'] businesses, not from the location of their activities"); Philadelphia v. New Jersey, 437 U.S. 617, 626-627 (1978) (differential treatment permissible if "there is some reason, apart from . . . origin, to treat [entities] differently" [emphasis supplied]).

Hess); Chemical Waste Mgmt., Inc. v. Hunt, 504 U.S. 334, 344 n.6 (1992). The burden to show discrimination against interstate commerce rests on the party challenging the validity of a statute. See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979); Family Winemakers of Cal. v. Jenkins, 592 F.3d 1, 9 (1st Cir. 2010). If this burden is carried, the discriminatory law is "virtually per se invalid." Department of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008), citing Oregon Waste, 511 U.S. at 99.[11]

3. Analysis. a. Discriminatory effect. The satellite companies argue that the excise tax discriminates against interstate commerce in its effect by disadvantaging the satellite companies and benefiting the cable companies. The department responds, first, that the cable companies and the satellite companies do not represent in-State and out-of-State interests, respectively. The department argues also that the

_____

[11] "[N]ondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or., 511 U.S. 93, 99 (1994), quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). The satellite companies do not contend that the excise tax fails this test. Conversely, a discriminatory statute may be upheld if "the State has no other means to advance a legitimate local purpose." United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338-339 (2007), citing Maine v. Taylor, 477 U.S. 131, 138 (1986). The Department of Revenue has not argued that the excise tax satisfies this requirement.

excise tax is not discriminatory because the cable and satellite companies are not similarly situated.

For the reasons we describe, we adopt the latter argument. In so doing, we follow the other courts that have considered and rejected the satellite companies' challenges to the laws of other States.  See Directv, Inc. v. Treesh, 487 F.3d 471 (6th Cir. 2007) (Treesh I), cert. denied, 552 U.S. 1311 (2008); DIRECTV, Inc. v. State, 178 N.C. App. 659 (2006); DIRECTV, Inc. v. Levin, 128 Ohio St. 3d 68 (2010), cert. denied, 133 S. Ct. 51 (2012).  We assume for purposes of our analysis, while appreciating the weighty arguments to the contrary, that the cable companies and the satellite companies represent in-State and out-of-State interests, respectively.[12]

_____

[12] As to this issue, compare Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 218 (2d Cir. 2004) ("For dormant [c]ommerce [c]lause purposes, the relevant 'economic interests' . . . are parties using the stream of commerce, not those of the state itself"), with Westinghouse Elec. Corp. v. Tully, 466 U.S. at 403-404 (discussing cases in which "the Court struck down state tax statutes that encouraged the development of local industry by means of taxing measures that imposed greater burdens on economic activities taking place outside the State than were placed on similar activities within the State"); Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 42 n.9 (1980) ("discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism we have identified"); and Philadelphia v. New Jersey, 437 U.S. at 627 ("The Court has consistently found parochial legislation . . . to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk . . . , or to create jobs by keeping industry within the State . . . , or to preserve the State's financial resources

i.  The broader context.  The excise tax applies to satellite companies only.  Our analysis must not be "divorced," however, from the broader context of the act; we are required to consider the regulatory scheme "as a whole."  See West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 201 (1994) (West Lynn Creamery).  Accord DIRECTV, Inc. v. Tolson, 513 F.3d 119, 122 (4th Cir. 2008) (Tolson); Zenith/Kremer Waste Sys., Inc. v. West Lake Superior Sanitary Dist., 572 N.W.2d 300, 304 (Minn. 1997), cert. denied, 523 U.S. 1145 (1998).  See also Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U.S. 575, 589 n.12 (1983) (United States Supreme Court "evaluat[es] the relative burdens of different methods of taxation" in commerce clause cases).  As described supra, both the cable companies and the satellite companies are subject to corporate income taxes, sales taxes, real property taxes, and personal property taxes. The cable companies are, in addition, subject to obligations in money and in services to local governments.

The satellite companies suggest that the cable companies' obligations toward local governments should play no part in our analysis of the ways in which the two types of company are treated.  In the satellite companies' view, these obligations

---

from depletion by fencing out indigent immigrants" [citations omitted]).

are merely "rent" payments imposed on cable companies on the basis of the use that they, but not the satellite companies, make of public spaces. We do not agree.

The localities' power to charge franchise fees as to cable companies but not satellite companies flows, not from the localities' ownership of public property, but from statutory provisions. A Federal statute provides that, subject to certain limitations, "any cable operator may be required . . . to pay a franchise fee." 47 U.S.C. § 542(a) (2012). The imposition of such fees is facilitated by a Massachusetts statute that prohibits the construction or operation of any cable system "in any city or town . . . without first obtaining . . . a written license from each city or town." G. L. c. 166A, § 3. Franchise fees and related obligations are, in this sense, not rent payments, but rather statutorily authorized tax payments. See Tolson, 513 F.3d at 123, 125-126 & n.3 (holding that cable franchise fees are "taxes" for purposes of Tax Injunction Act, 28 U.S.C. § 1341 (2012), and explaining that "a sum fixed for the privilege of doing business" is unlike "[a] per-pole charge levied . . . for the use of [a] city's telegraph poles").

Correspondingly, cable companies do not obtain leases or other property rights in return for their franchise fees. What they do receive in return are special privileges. See Tolson, 513 F.3d at 126 n.3 ("Taxpayers . . . often receive something of

value in exchange for their taxes").  In the Superior Court proceedings, the satellite companies recognized that the privileges granted in exchange for franchise fees are "the privilege of doing business in a locality and . . . the rights to access public-rights-of-way in a locality."  See 47 U.S.C. § 522(9) (2012) (franchise permits "construction" or "operation" of cable system); Treesh I, 487 F.3d at 480 (Kentucky cable franchises provided "the right to conduct business and use local rights-of-way").[13]

Because of the method by which they deliver their programming, the satellite companies do not need to access public rights-of-way.  The privilege of doing business with local consumers, on the other hand, is one that benefits the satellite companies no less than the cable companies.  Consequently, if not for the Telecommunications Act's prohibition on the imposition of local taxes on satellite services, the satellite companies "certainly could have been"

---

[13] At his deposition, a representative of Charter Communications Inc. defined a franchise fee as "a fee to authorize [the company] to do business in [a] community," paid as compensation both for "using the public right-of-way" and for "being authorized to provide the service to customers."  A representative of Comcast Corporation (Comcast) testified that a franchise agreement "allow[s] [Comcast] to operate within [an] area by selling its products and services."  The representative agreed that the right to use public rights-of-way is "one component of a franchise."

subjected "to the tangled regime of local taxation and franchise fees" that applies to cable companies.  See Treesh I, 487 F.3d at 481.  Namely, by way of a statute akin to G. L. c. 166A, § 3, the Legislature could have forbidden the provision of video services by satellite without a license from a local authority. Cf. Commissioner of Corps. & Taxation v. Metropolitan Life Ins. Co., 327 Mass. 582, 584 (1951) (excise tax on insurance imposed "for the privilege of doing business in this Commonwealth").

In our analysis of whether the cable and satellite companies are subjected to "differential treatment . . . that benefits the former and burdens the latter," Oregon Waste, 511 U.S. at 99, we therefore consider the fact that each of these types of company is subject to unique obligations in connection with the privilege of selling video programming services to Massachusetts consumers.

ii.  Differences between the obligations of the cable and satellite companies.  The cable companies' local obligations and the excise tax imposed on the satellite companies are different in two ways.  First, the cable companies' obligations are collected piecemeal by an assortment of local authorities, whereas the satellite companies pay the entirety of the excise tax to the department.  Second, the cable companies' local obligations are made up of several components determined via negotiations with each locality, including franchise fees,

additional payments to support public-oriented programming, and services in kind.  The excise tax, on the other hand, is set at a uniform, flat rate.

These differences in the manners in which the cable and satellite companies are treated do not amount to actionable discrimination if they do not impose a greater burden on the satellite companies.  See Oregon Waste, 511 U.S. at 99.  These differences also are not discriminatory if they are rooted in meaningful differences between the two types of company.  See Tracy, 519 U.S. at 298.[14]  We conclude that, on the summary judgment record, the satellite companies have "no reasonable expectation" of proving a discriminatory effect; there is thus no genuine issue of material fact, see HipSaver, Inc. v. Kiel, 464 Mass. 517, 522 (2013) (HipSaver), quoting Kourouvacilis v.

---

[14] The bare existence of differences between the satellite and cable companies would not alone defeat allegations of discrimination, because a statute does not "need to be drafted explicitly along [S]tate lines in order to demonstrate its discriminatory design."  Amerada Hess, 490 U.S. at 76. Differences between entities render regulation nondiscriminatory only if they represent substantive reasons to treat the entities differently, rather than proxies for geographical distinctions. See West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 201 (1994) (West Lynn Creamery), quoting Best & Co. v. Maxwell, 311 U.S. 454, 455-456 (1940) ("The commerce clause forbids discrimination, whether forthright or ingenious.  In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce").

General Motors Corp., 410 Mass. 706, 716 (1991), and the department is entitled to judgment as a matter of law.

A. Method of collection. We examine first the divergent manners by which payments for the privilege of doing business in Massachusetts are collected from cable and satellite companies, respectively. As previously described, the excise tax is collected in its entirety by the department, whereas the cable companies owe varying obligations to each of the localities in which they operate. This instance of differential treatment, rather than burdening the satellite companies, is advantageous to them. The excise tax provides a streamlined method of collection, far less cumbersome than the cable companies' assortment of local obligations.

Congress conferred this benefit on the satellite companies by design in the Telecommunications Act. Section 602(a) of that statute states that "[a] provider of . . . satellite service shall be exempt from . . . any tax or fee imposed by any local taxing jurisdiction on direct-to-home satellite service." 110 Stat. at 144. The phrase "tax or fee" is defined to include a number of different types of taxes, including any "privilege tax" and any "fee that is imposed for the privilege of doing business." Telecommunications Act § 602(b)(5), 110 Stat. at 145. On the other hand, the same section states that it "shall not be construed to prevent taxation of a provider of . . .

satellite service by a State." Telecommunications Act § 602(c), 110 Stat. at 145.

The decision to excuse the satellite companies from burdensome dealings with local authorities was rooted in the characteristics of their operations. "Congress's intent . . . was not to spare the [satellite] providers from taxation as such, but to spare national businesses with little impact on local resources from the administrative costs and burdens of local taxation." DirecTV, Inc. v. Treesh, 290 S.W.3d 638, 643 (Ky. 2009), cert. denied, 558 U.S. 1111 (2010) (Treesh II). This objective was explained on the floor of the House of Representatives by Congressman Henry Hyde:

> "[Satellite companies] utilize satellites to provide programming to their subscribers in every jurisdiction. To permit thousands of local taxing jurisdictions to tax such a national service would create an unnecessary and undue burden on the providers of such services. . . . The power of the States to tax this service is not affected by [Telecommunications Act §] 602."

142 Cong. Rec. H1145, H1158 (Feb. 1, 1996). See W. Hellerstein, State Taxation ¶ 4.25[1][l] (3d ed. 2014) ("Congress was concerned with burdening [satellite] providers with the requirement of complying with taxes in thousands of local taxing jurisdictions. This was the rationale for preempting local, but not [S]tate, taxing authority" [emphasis in original]). In sum, the divergent methods by which payment for the privilege of doing local business is collected from the cable and satellite

companies are both advantageous to the satellite companies and rooted in the different operational methods employed by the two types of company.

B. Method of calculation. We turn to the different methods by which the obligations of the cable and satellite companies are calculated. Whereas the satellite companies' services are subject to a flat tax rate of five percent of gross revenues, the cable companies' obligations are composed of (a) franchise fees, running to approximately three to five per cent of gross revenues; (b) additional fees, used to support public-oriented programming, averaging 1.09% of gross revenues; (c) services, facilities, and equipment for the use of public, educational, and governmental channels; (d) free video programming services delivered to municipal buildings, schools, and libraries; and (e) requirements imposed by local governments concerning service quality and customer service. On the basis of these facts, the satellite companies do not have a "reasonable expectation" of proving that their obligations are more burdensome than those of the cable companies.[15] See

---

[15] Implicit in the satellite companies' argument is the assumption that because they, unlike the cable companies, do not use local rights-of-way, the Legislature is required to impose a heavier tax burden on the cable companies. As explained by the United States Court of Appeals for the Sixth Circuit, however, "States and local government are under no mandate to charge for the use of local rights-of-way; this is readily apparent from

HipSaver, 464 Mass. at 522.  This is particularly so given that no affidavits or other evidence has been submitted that might shed light on the value of the in-kind services that cable companies provide to local governments.

Moreover, even if the satellite companies were able to show some discrepancy between the amounts charged to them and to the cable companies, respectively, this discrepancy would be permissibly attributable to important differences between the cable and satellite industries, some of which we have already discussed.

For one, franchise fees are, as noted, capped by Federal law at five per cent of gross revenue.  See 47 U.S.C. § 542(b) (2012).  Massachusetts law does not require that cable's franchise fees be any lower.  It follows that if the cable companies' obligations to local governments amount to a lighter burden than the satellite companies' excise tax, this discrepancy results from certain localities' consent to reduce franchise fees from the statutory maximum.  In this sense, any benefit to the cable companies results from the fact that they are required, unlike the satellite companies, to negotiate

the fact that not every road is a toll road. . . .  The provision of access to the [S]tate infrastructure free of charge is an acceptable option that the [S]tate may exercise." Directv, Inc. v. Treesh, 487 F.3d 471, 479 (6th Cir. 2007), citing West Lynn Creamery, 512 U.S. at 199 n.15.

separate arrangements with an array of local governments.  In turn, this difference between the treatment of the cable and satellite companies is rooted, as we have explained, in the different nature of these businesses, namely in the fact that the cable companies, unlike the satellite companies, cannot avoid interface with local governments.  See Treesh II, 290 S.W.3d at 643.

As the department argues, another difference between the cable and satellite companies' respective operations would support the imposition of a somewhat lower tax rate on cable. This difference lies in the respective regulatory regimes to which the two types of company are subject.

When the technology for satellite provision of video programming became available in the 1980s, the Federal government "concluded that the public interest is best served by a flexible regulatory approach."  2 D.L. Brenner, M.E. Price, & M.I. Meyerson, Cable Television and Other Nonbroadcast Video, Law and Policy, § 15:5 (2014).  Accordingly, the satellite industry was subjected to "regulatory requirements [that are] minimal . . . .  This approach allows [satellite] operations to experiment with service offerings and methods of financing.  Few rules exist."  Id.  See 2 C.D. Ferris & F.W. Lloyd, Telecommunications Regulation:  Cable, Broadcasting, Satellite, and the Internet ¶ 20.04[5][b], at 20-9 (rev. ed. 2014).

Cable, on the other hand, a veteran industry with well-established methods of operation, has long been subject to an extensive scheme of Federal regulation. See 1 C.D. Ferris & F.W. Lloyd, Telecommunications Regulation: Cable, Broadcasting, Satellite, and the Internet ¶ 5.04[1], at 5-5 (rev. ed. 2014) (discussing development of cable in 1940s and 1950s); id. at ¶ 5.04[3][b], at 5-7 (rev. ed. 2014) (discussing origins of cable regulation in 1960s). Among other things, cable companies must comply with standards concerning the technical operation and signal quality of their programming. See 47 U.S.C. § 544(e) (2012); 47 C.F.R. §§ 76.601-76.640 (2013). They are subject to minimum standards for office hours, telephone availability, installations, outages, service calls, and billing. See 47 U.S.C. § 552(b) (2012); 47 C.F.R. § 76.309 (2013). They are required to enable their customers to receive emergency information. See 47 U.S.C. § 544(g) (2012). They must provide subscribers with a device that permits the subscribers to limit access to certain channels, see 47 U.S.C. § 544(d)(2) (2012), and they may be forbidden by localities to provide access to channels that carry obscene content. See 47 U.S.C. § 544(d)(1) (2012).

In addition, the rates for the provision of basic cable services are determined by Federal regulations, unless the Federal Communications Commission finds that these services are

subject to "effective competition."  See 47 U.S.C. § 543(a)(2) (2012); 47 C.F.R. §§ 76.901-76.990 (2013).  Cable companies may not discriminate between different "tiers" of subscribers in the provision of programming offered on a per-channel or per-program basis.  See 47 U.S.C. § 543(b)(8)(A) (2012).  With some exceptions, cable companies are required to operate a geographically uniform rate structure.  See 47 U.S.C. § 543(d) (2012).[16]

The divergent regulatory regimes that govern the cable and satellite companies' respective operations are relevant to the selection of the tax obligations to which these companies are subjected.  Cf. Tracy, 519 U.S. at 295-297, 300-301 (considering regulatory obligations of local utility companies); National Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown, 567 F.3d 521, 526-527 (9th Cir. 2009) (considering regulatory obligations of optometrists and ophthalmologists).  The rate of the excise tax permissibly may allow for the fact that satellite companies do not bear the additional regulatory burdens imposed

---

[16] In addition, cable companies are required to devote a greater percentage of their channel capacity to public, educational, and government programming than satellite companies are.  See 47 U.S.C. §§ 335, 531, 534, 535 (2012).  Compare 1 C.D. Ferris & F.W. Lloyd, Telecommunications Regulation:  Cable, Broadcasting, Satellite, and the Internet ¶ 7.15[2], at 7-40 (rev. ed. 2014), with 2 C.D. Ferris & F.W. Lloyd, Telecommunications Regulation ¶ 20.4[6][c], at 20-11 (rev. ed. 2014).

on cable companies.  The Legislature also permissibly may wish to support the provision of cable services, in order to ensure that this regulated product remains available to Massachusetts consumers.  See Treesh I, 487 F.3d at 481 (Kentucky may have sought to support viability of cable "for reasons entirely unrelated to geography -- for example, that cable providers often provide [I]nternet access as well, that cable providers are more likely to provide public access channels, etc.").

In summary, given the nuances of the divergence between the ways in which the cable and satellite companies are treated, examined in light of the differences between the ways in which these two types of company do business, the satellite companies have no reasonable expectation of proving that the excise tax discriminates against interstate commerce in its effect.  See HipSaver, 464 Mass. at 522.  No genuine issue of material fact was presented, therefore, and the department was entitled to judgment as a matter of law.

b.  Discriminatory purpose.  The satellite companies contend also that the excise tax is unconstitutional because it is discriminatory in its purpose.  This argument relies almost entirely on lobbying materials prepared on behalf of the cable

industry.[17]  For instance, a letter sent by cable lobbyists to members of the Legislature read, in part:

> "Satellite TV companies have long enjoyed a one-way relationship with Massachusetts, selling their service here but giving almost nothing back.  Unlike cable companies, satellite providers pay no personal property or real estate taxes . . . . Nor do satellite companies make investments in the economy or community, as cable providers do. Comcast alone, for example, employs more than 5,000 people in Massachusetts who collect more than $336 million in salary and benefits."

The satellite companies assert that lobbying efforts of this nature indicate that the excise tax was intended to reward the cable companies for their contributions to the Commonwealth's economy.  We conclude that the summary judgment record does not support a reasonable expectation that a discriminatory purpose could be proved.  See HipSaver, 464 Mass. at 522.

"It is well settled that a statute is presumed to be constitutional, and every rational presumption in favor of its validity is to be made."  Cote-Whitacre v. Department of Pub. Health, 446 Mass. 350, 367 (2006).  See Commonwealth v. King, 374 Mass. 5, 16 (1977).  For the reasons previously explained, the excise tax is understood most naturally as an element of a

---

[17] The satellite companies point also to the testimony of a high-ranking satellite company executive who asserted at deposition that he had been told by members of the Legislature that they would vote for the excise tax, at least in part, because of the cable industry's "significant local presence." Like the Superior Court judge, we ascribe little significance to this vague testimony.

balanced scheme of taxation that imposes corresponding burdens, different in nuanced and rational ways, on the cable and satellite companies.  The burden of establishing that the statute was motivated not by this legitimate goal, but rather by a discriminatory purpose, is necessarily difficult to carry. See Treesh I, 487 F.3d at 480 (affirming dismissal of discrimination claim where, "[w]hile a purpose of the [statute] might have been to aid the cable industry rather than the satellite industry . . . there were clearly many other purposes," including "collecting taxes from the previously untaxed, burgeoning satellite industry").

The evidence offered by the satellite companies does not suffice to carry this burden.  In the context of statutory interpretation, we have cautioned against "confus[ing] the intention of the private proponents of legislation with the intentions of the legislative body that enacted the statutory change, to the extent we may ascertain them.  They are not necessarily the same." Commonwealth v. Ray, 435 Mass. 249, 257 n.15 (2001).  The United States Supreme Court similarly has explained that:

> "Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the [Legislature].  It becomes far more so when we consult sources still more steps removed . . . and speculate upon the significance of the fact that a certain interest group sponsored or opposed particular legislation."

*Circuit City Stores, Inc*. v. *Adams*, 532 U.S. 105, 120 (2001), citing *Kelly* v. *Robinson*, 479 U.S. 36, 51 n.13 (1986).  We cannot assume, in other words, that the Legislature embraced the reasons expressed by private interests, such as lobbyists for the cable companies, merely because those interests advocated vocally for a statute.[18]

Moreover, the lobbying materials identified by the satellite companies also make repeated reference to the goal of "tax parity."  Written testimony by a cable industry executive before a committee of the Legislature stated, for instance, that the excise tax would "ensure[] that the overall level of taxation is equal among video providers, so that all multichannel video providers operate on a level playing field . . . . Tax parity ensures fair competition and true consumer choice."  Other communications stressed that, before the 2010 appropriations act was passed, the satellite companies paid no tax corresponding to the franchise fees paid by cable companies.  A letter to legislators from the New England Cable and Telecommunications Association stated that the excise tax would create a "competitively neutral tax policy for the

_____

[18] A representative of DIRECTV, LLC acknowledged at his deposition that his company does not know whether the cable companies' lobbying materials had an impact "on any individual legislator" or "on the Legislature as a whole."

delivery of video signals," and described the tax as "expanding the [five per cent] franchise fee to include satellite companies." These facts further weaken the suggestion that the Legislature was motivated by sympathy for in-State interests as such.

The conclusion that the excise tax was not intended to confer a special disadvantage on the satellite companies is reinforced by the context in which the tax was enacted. As mentioned, in addition to creating the excise tax, the 2010 appropriations act also imposed a personal property tax on "[p]oles, underground conduits, wires and pipes of telecommunications companies." St. 2009, c. 27, § 25, amending G. L. c. 59, § 18. This provision increased Comcast's annual tax obligations by approximately $5.1 million. It also resulted, in 2010, in a tax assessment of approximately $29.8 million against Verizon. Verizon employs approximately 9,500 people in Massachusetts, 4,000 more than the cable companies. These facts support the conclusion that the excise tax was not intended to discriminate against interstate commerce, but rather was part of an effort to increase, across the board, the amount of tax revenue collected from the video programming industry.

Judgment affirmed.